2009 WY 16

**FOXLEY & CO., a Delaware Corporation, Appellant (Plaintiff),**

v.

**John R. ELLIS and Patricia A. Ellis, Appellees (Defendants).**

No. S–07–0256.

Supreme Court of Wyoming.

Feb. 11, 2009.

426

Representing Appellant: Stephen H. Kline of Kline Law Office, PC, Cheyenne, Wyoming.

Representing Appellee: Paul J. Hickey, Roger C. Fransen, and O'Kelley H. Pearson of Hickey & Evans, LLP, Cheyenne, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Foxley & Co. (hereinafter referred to as "Foxley") is a corporation involved in cattle ranching operations. John R. and Patricia A. Ellis are husband and wife. They were the owners of a ranch near Medicine Bow, Wyoming, commonly known as the Difficulty Creek Ranch, which they sold to Foxley. Foxley claims the Ellises never informed it of a common use agreement with a neighboring ranch that applied to grazing on a portion of the Difficulty Creek Ranch. Foxley sued the Ellises for, among other things, breach of contract and breach of warranty deed. The district court granted summary judgment to the Ellises on both counts. Finding that genuine issues of material fact exist, we reverse.

[¶ 2] On a further issue, Foxley attempted to amend its complaint for a second time six months after it filed its initial complaint. In the interim, extensive discovery had been conducted. The district court determined that allowing the amendment would unduly prejudice the Ellises and denied the motion to amend. Finding no abuse of discretion

under the circumstances, we affirm this ruling.

## ISSUES

[¶ 3] Foxley presents three issues for our consideration:

1. Did the District Court err in granting summary judgment to Appellees on Appellant's breach of contract claim and in denying Appellant's Motion for Summary Judgment on the same issue?

2. Did the District Court err in granting summary judgment to Appellees on Appellant's breach of warranty claim and in denying Appellant's Motion for Summary Judgment on the same issue?

3. Did the District Court err in denying Appellant's Motion to File a Second Amended Complaint?

## FACTS

[¶ 4] The Difficulty Creek Ranch has been in the Ellis family since 1899. It is comprised almost equally of deeded and leased lands, for a total of around 24,600 acres. The majority of the leased lands are owned by the federal government and administered by the Department of the Interior through the Bureau of Land Management (BLM). The BLM lands integrate with the private lands in a checkerboard pattern.[1]

[¶ 5] One such checkerboard area is known as the "West Pasture," comprising just under 4,500 acres. It contains two full private sections plus a private lease section. It also contains three full federal sections plus parts of two other federal sections.

[¶ 6] In 1941, West Pasture lands became subject to a Memorandum of Understanding (the "Agreement") entered into by John Ellis's father and neighboring ranchers. Otherwise known as a range line agreement, the Agreement allotted grazing priorities amongst the neighbors on lands controlled by each neighbor. The sole remaining successor in interest to this Agreement is the 9V Ranch, which, pursuant to the Agreement, enjoys grazing rights in the West Pasture in common with Foxley.

[¶ 7] Exactly which West Pasture lands are covered by the Agreement—federal and/or private lands—is disputed. At the very least the currently accepted application of the Agreement is to allot 9V common use rights to graze on the federal sections of land in the West Pasture. For the 2002 grazing season, the BLM allotted 9V 314 AUMs[2] for federal land in the West Pasture. The West Pasture, however, has historically been operated as a single integrated unit. There is no internal fencing. As a practical matter, therefore, 9V cattle are free to range all lands within the West Pasture.

[¶ 8] In 2004, the Ellises entered into extensive negotiations with Foxley for the sale of Difficulty Creek Ranch. Ultimately, in October 2004, Foxley purchased the Difficulty Creek Ranch. It is undisputed that Foxley was never expressly informed of 9V's common use rights to lands in the West Pasture before the purchase of the Difficulty Creek Ranch.

[¶ 9] Foxley did not discover the common use rights until the spring of 2005. After discovering the common use, Foxley brought suit against the Ellises and their brokers, alleging many different causes of action. All causes of action were either dismissed or summarily adjudicated. The causes of action at issue in this appeal are breach of contract and breach of warranty deed against the Ellises. Further facts will be developed in the discussion below as necessary.

## DISCUSSION

[¶ 10] We review de novo a grant of summary judgment. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party

---

1. A checkerboard pattern is a land pattern where alternate sections are federal land with intervening sections of private land. Consequently, federal lands, as well as private lands, adjoin only at their corners.

2. Animal Unit Months, or AUMs, is the productivity measurement used for valuing rangeland. The term "AUM" is defined as the amount of forage required to sustain a 1,000 pound cow, with or without a calf, for one month. Http://webgate.co.laramie.wy .us/_departments/_county_assessor/ag_info.asp.

is entitled to judgment as a matter of law. W.R.C.P. 56(c). A genuine issue of material fact is a disputed fact that, if proven, would establish or refute an essential element of a cause of action or a defense that the parties have asserted. *Jacobs Ranch Coal Co. v. Thunder Basin Coal Co., LLC,* 2008 WY 101, ¶ 8, 191 P.3d 125, 128–29 (Wyo.2008); *Metz Beverage Co. v. Wyoming Beverages, Inc.,* 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo. 2002). We review the facts in the record in the light most favorable to the party opposing the motion, affording to that party the benefit of all favorable inferences that may be drawn from the record. Any doubt regarding the existence of an issue of material fact must be resolved against the party seeking summary judgment. *Wyoming Bd. of Land Comm'rs v. Antelope Coal Co.,* 2008 WY 60, ¶ 7, 185 P.3d 666, 668 (Wyo.2008); *Linton v. E.C. Cates Agency, Inc.,* 2005 WY 63, ¶ 7, 113 P.3d 26, 28 (Wyo.2005).

*Application of the Agreement to Private Lands*

[¶ 11] The district court found the Agreement created common use rights to the BLM lands only, leaving the private lands unencumbered. The district court reasoned that, since the actual sale was for private lands only and the private lands were unencumbered, there could be no breach of contract or breach of warranty deed. The Ellises, of course, strongly rely upon this reasoning on appeal. As a result, we find it expedient to analyze the area of geographical coverage of the Agreement as a preliminary matter.

[¶ 12] Contrary to the finding of the district court, we find the Agreement ambiguous as to its coverage in the West Pasture. This Court construes contractual language as a matter of law. Its goal is to determine the intent and understanding of the parties. It begins the inquiry by determining whether the language of the contract is clear and unambiguous. *Reed v. Miles Land and Livestock Co.,* 2001 WY 16, ¶ 10, 18 P.3d 1161, 1163 (Wyo.2001). If the language is clear and unambiguous, the parties' intent is to be secured from the four corners of the contract. *Id.; Cliff & Co., Ltd. v. Anderson,* 777 P.2d 595, 598 (Wyo.1989).

[¶ 13] The language of a contract is to be construed within the context in which it was written, and this Court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made. *Carlson v. Flocchini Invs.,* 2005 WY 19, ¶ 15, 106 P.3d 847, 854 (Wyo.2005); *Polo Ranch Company v. City of Cheyenne,* 969 P.2d 132, 136 (Wyo. 1998). The language is also to be considered as a whole, taking into consideration the relationship between the various parts. *Collins v. Finnell,* 2001 WY 74, ¶ 15, 29 P.3d 93, 99 (Wyo.2001). This Court attempts to avoid a construction which renders a provision meaningless by striving to reconcile any provisions which apparently conflict before adopting a construction which would nullify any provision. *Stone v. Devon Energy Prod. Co., L.P.,* 2008 WY 49, ¶ 18, 181 P.3d 936, 942 (Wyo.2008).

[¶ 14] As applied to the Agreement, reading the Agreement as a whole, we find it does affect private lands. On the one hand, the original parties to the Agreement were neighboring ranchers who were "the users of the federal range in T. 24 N., R. 79 and 80 and T. 23 N., R. 79 and 80." However, the priorities are set within what the parties termed "blocks" of land such as the "Ellis Block" and the "Chace Block." These Blocks are undefined in the Agreement.

[¶ 15] The language of the Agreement indicates the blocks included both federal lands and private lands. For instance, the Agreement provides "the users will determine at this meeting the priority of these [sic] using the federal range in this area together with a rating of the federal range and their privately owned property" and later "the users set the rating on the federal range as six acres per cow per month and on the unfenced private owned land at 5 acres per cow per month." In allocating grazing priorities within each block, the Agreement divides the stock among "the area being worked." The fact that the "area being worked" is more than just the federal lands is demonstrated by the individual allocations. For each block,

the parties listed stock that would be allowed on federal range lands and stock that would be allowed "elsewhere."

[¶ 16] These references reflect a direct impact of the Agreement on private lands. How the Agreement impacts the lands within the West Pasture, however, is unclear. 9V's predecessor in interest was Gust Nelson. In the Agreement, Nelson was given priority for 111 stock in the Ellis Block—52 on federal range and 59 "elsewhere." This certainly suggests Nelson's allotment included Ellis private lands. Ambiguity exists, however, because of the lack of a more precise definition of the Ellis Block and "elsewhere." This ambiguity prevents the Agreement from being used as unambiguous support for the Ellises' argument that private lands are unaffected.[3] Because we are reviewing the grant of summary judgment and Foxley therefore is entitled to receive the benefit of all reasonable inferences, we will proceed with our discussion operating under the assumption that common use rights exist on private lands as well as federal lease lands in the West Pasture.

*Breach of Sales Contract*

[¶ 17] The sales contract in this case consists of multiple documents. First is the initial offer to purchase by Foxley. This document contains most of the standard provisions for the sale. The Ellises counteroffered, with the only change being the price. Attached to this counteroffer were multiple exhibits including the BLM lease and grazing allotments. Foxley replied with another counteroffer to purchase at a slightly higher price than initially offered, although below the Ellises' requested price. Again, no basic provisions other than the purchase price were altered. The Ellises accepted this counteroffer. Finally, there is an addendum, offered by Foxley and accepted by the Ellises, giving Foxley time to conduct a due diligence investigation into the property, specifically including leased lands and ranching operations. All documents are expressly incorporated to collectively form the sales contract.

[¶ 18] Foxley points to several different provisions in the sales contract that it alleges were breached by the existence of common use in the West Pasture. For instance, Foxley alleges the common use agreement violates a contractual provision stating: "Title shall be merchantable in Seller.... Title shall be subject to ... easements, restrictive covenants, and reservations of record and the following additional encumbrances which shall NOT be released or discharged at closing: none."

[¶ 19] There is some discussion on appeal as to whether grazing rights amount to an encumbrance on the private lands. Grazing rights constitute a profit a prendre, otherwise known simply as a profit. *Denver Joint Stock Land Bank of Denver v. Dixon*, 57 Wyo. 523, 538, 122 P.2d 842, 847 (1942) (profits include the right "to feed beasts"). Profits fit within the general legal category of servitudes:

> A "servitude" is a general category that includes a variety of non-possessory interests in land, including easements and profits. *Id.* [Restatement (Third) of Prop.: Servitudes] § 1.1(2) [ (2000 & Cum.Supp. 2006) ]. "An easement is defined as 'an interest in land which entitles the easement holder to a limited use or enjoyment over another person's property.'" *Hasvold v. Park County Sch. Dist. No. 6*, 2002 WY 65, ¶ 13, 45 P.3d 635, 638 (Wyo.2002) (quoting *Mueller v. Hoblyn*, 887 P.2d 500, 504 (Wyo.1994)). Profits have been referred to as "easements 'plus.'" Restatement (Third) of Prop.: Servitudes § 1.2 cmt. e. The Restatement explains that "[p]rofits are easements (rights to enter and use land in the possession of another) plus the right to remove something from the land." *Id.* Similarly, 28A C.J.S. *Easements* § 9 (1996) notes that "[t]he [profit] right is in the nature of an easement, and it is often called an easement; but it is more than an

---

**3.** There is also a theoretical possibility that, even if the Agreement does not directly affect the private lands in the West Pasture, Foxley may still be required to allow 9V an easement or other access rights to move its stock through the private lands. Otherwise, because of the checkerboard pattern, 9V will have no direct access between the BLM sections. The reciprocal is also true—if Foxley fences its private lands it will not have direct access between its sections.

easement. It is an interest or an estate in the land itself as distinguished from a mere personal obligation of the owner of realty." *Cf.* 25 Am.Jur.2d *Easements and Licenses* § 3 (2004) ("[A] profit a prendre is a liberty in one person to enter another's soil and take from it the fruits not yet carried away. A profit a prendre is therefore distinguishable from an easement, since one of the features of an easement is the absence of all right to participate in the profits of the soil charged with it.") In agreement with these general rules, we have said that a "profit a prendre is ... a right to take a certain thing or things from the land of another. If, accordingly, the right to take does not exist, the right cannot, at least strictly, be called a profit a prendre." *Denver Joint Stock Land Bank of Denver v. Dixon,* 57 Wyo. 523, [538,] 122 P.2d 842, 847 (1942).

*Seven Lakes Development Co., L.L.C. v. Maxson,* 2006 WY 136, ¶ 12, 144 P.3d 1239, 1245–46 (Wyo.2006).

[¶ 20] From the above, it is clear that a profit is an encumbrance, which is defined simply as "any property right that is not an ownership interest." Black's Law Dictionary 568 (8th ed. 2004).[4] This leads us back to the original question of whether the Agreement affects private lands. We have already determined the answer to this question is dependent upon unanswered questions of material fact. Summary judgment on this ground is thus inappropriate under these circumstances.

[¶ 21] The Ellises present three more defenses to the breach of contract claim. First, they argue, as a matter of law, the contractual language shifted the risk of nondisclosure of the common use rights to Foxley. They are partially correct. For instance, Foxley consistently references all the opportunities the Ellises had to disclose the common use during the negotiations for the sale of the ranch. The contract, howev-

er, provides that Foxley, in making its decision to enter into the sales contract, was not relying on any representations by the Ellises "as to any condition which Buyer deems to be material." The risk of nondisclosure before the entry of the sales contract is placed accordingly on Foxley. *See generally Snyder v. Lovercheck,* 992 P.2d 1079 (Wyo.1999).

[¶ 22] As for any potential failure to disclose the common use in the contract itself, the Ellises argue Foxley voluntarily accepted the attendant risks by proposing and entering into the Addendum to the Contract. The Addendum gave Foxley time to conduct a due diligence investigation into "the leased land" and "ranch operations." In continuation, the Addendum provides that if Foxley did not inform the Ellises of any problems by the end of the due diligence investigation period, "then the condition and characteristics of the Property shall be deemed satisfactory to the Buyer."

[¶ 23] We agree that, as written, the Addendum shifts the risk of loss from lack of disclosure of the common use rights to Foxley, but it is not a blanket risk. By the terms of the Agreement, it is limited to facts that reasonably could be discovered in a "due diligence" investigation. How extensively Foxley should have searched, and what information could have been discovered as a result of such search, are issues of material fact that have yet to be resolved.

[¶ 24] Second, the Ellises claim they did disclose the common use rights. It is unrefuted Mr. Ellis instructed his real estate broker to inform Foxley's real estate broker of the common use rights. Foxley's real estate broker, however, testified at deposition that he was never informed of such rights, creating an issue of material fact.

[¶ 25] Additionally, the Ellises claim they expressly informed Foxley of the common use rights in the exhibits attached to their counter-offer. The exhibits included a BLM grazing allotment of 314 AUMs in the West

---

4. "Encumbrance" is also defined in more detail as any right or interest in land subsisting in a third person, to the diminution of the value of the land, not inconsistent with the passing of private simple title. Black's Law Dictionary 473 (5th ed. 1999); 9 G. Thompson, *Law of Real Property* § 82.10(c)(3), at 612 (David A. Thomas, ed., 1999). Profits are so named because they involve the sharing of the "profits" of the land. This is by definition an interest in land devaluing the land.

Pasture for 2002. Handwritten on top of the page is "9V." Foxley saw this document, but since it expired in 2002, it discerned no significance in it. The Ellises argue the document disclosed common use by 9V irrelevant of the date. We find, given the circumstances of this case, whether this document constitutes a definitive disclosure of common use in the West Pasture by 9V is an issue of material fact.

[¶ 26] Third, the Ellises argue the 2002 grazing allotment at least should be accepted as having put Foxley on notice of the possibility of common use rights. They point again to Foxley's opportunity to conduct a due diligence investigation. The Ellises argue Foxley should be charged with the responsibility for following up on the document, thus relieving them of any further duty to disclose. This argument is of no avail against the grant of summary judgment. As already noted, how extensive Foxley's due diligence investigation should have been under these circumstances is a question of material fact. The existence of the 2002 grazing allotment is simply one fact to be considered. We do not find it to be dispositive as a matter of law.

*Breach of Warranty Deed*

[¶ 27] A warranty deed is a contract. Thus:

> [w]e interpret a warranty deed like a contract "from specific language of the deed," and "begin by looking at the instrument itself." We must first examine the terms of the deed and give them their plain and ordinary meaning. Plain meaning is that "meaning which [the] language would convey to reasonable persons at the time and place of its use." When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. Determining the parties' intent is our prime focus in interpreting or construing a contract.

*Gilstrap v. June Eisele Warren Trust,* 2005 WY 21, ¶ 12 106 P.3d 858, 862 (Wyo.2005) (internal citations omitted). *See also Boley v. Greenough,* 2001 WY 47, ¶ 11, 22 P.3d 854, 858 (Wyo.2001).

[¶ 28] When a person conveys property by warranty deed, generally the property is conveyed free of all encumbrances. Wyo. Stat. Ann. § 34–2–103(b) (LexisNexis 2007). Consequently, any encumbrances on the seller's title needs to be specifically listed and excluded from the warranty. Otherwise, the seller will be in breach of the warranty.

[¶ 29] In this case, the Ellises conveyed their property "subject only to ... easements, restrictive covenants, and reservations of record." The common use rights are not expressly excepted. Questions of material fact exist as to whether the common grazing rights are of record. Questions of material fact also exist as to the extent the Agreement encumbers Foxley's private land. The breach of warranty claim cannot be decided without first answering these questions of material fact.

[¶ 30] The Ellises, relying on *Gilstrap v. June Eisele Warren Trust,* 2005 WY 21, 106 P.3d 858 (Wyo.2005), argue a breach of warranty can only occur when the buyer suffers an actual or constructive eviction. This would be true if Foxley was claiming a breach of the warranty of quiet and peaceful possession. The issue in *Gilstrap* involved the consequences of an attempt to grant more property than one owns. As the opinion unfolded, the breach of warranty issue under the circumstances in *Gilstrap* would have been for a breach of quiet and peaceful possession. It was in this context that this Court noted, to prove breach of warranty, it would be necessary to show actual or constructive eviction. *Id.* at ¶ 27, 106 P.3d at 866.

[¶ 31] Foxley, on the other hand, is alleging a breach of the warranty against encumbrances.

> A covenant of title which warrants that the premises are free from encumbrances is an agreement to indemnify the covenantee in the event that he or she suffers any loss to the value of the premises due to the existence of an encumbrance. An "encumbrance" is any right or interest existing in a third person which diminishes the value of the estate to the grantee, but which is

consistent with the passage of the estate to the grantee.

* * * *

Encumbrances can usually be classified as one of three types: (1) servitudes, (2) encumbrances, as that term is used in its more technical sense—i.e., liens or charges on the land, and (3) present or future estates which may be carved out of the estate conveyed.

* * * *

A servitude generally affects the land or its use and enjoyment physically. It reduces the value of the land because a purchaser will not pay as much for a parcel of land which is limited in its usage as he or she would for an unencumbered one. 14 Richard R. Powell, *The Law of Real Property* § 81A.06[2][c][i] and [ii], at 117–18 (Michael Allan Wolf, ed., 1997). As we have already discussed, common grazing rights, a profit, fit within the general category of a servitude. The warranty is against the diminution in value of the land caused by the servitude, not total loss of land. Whether the Ellises breached this warranty is dependent on all the issues of material fact we have previously noted.

*Denial of Foxley's Motion to Amend Complaint*

[¶ 32] The decision to allow amendment to pleadings is vested within the sound discretion of the district court and subject to reversal on appeal only for an abuse of that discretion. *Askvig v. Wells Fargo Bank Wyoming, N.A.*, 2005 WY 138, ¶ 18, 121 P.3d 783, 788 (Wyo.2005); *Johnson v. Sikorski*, 2004 WY 137, ¶ 12, 100 P.3d 420, 423 (Wyo.2004); *Breazeale v. Radich*, 500 P.2d 74 (Wyo.1972). Leave to amend pleadings "shall be freely given when justice so requires." W.R.C.P. 15(a). In determining whether to allow amendment, this Court has suggested the following test be followed:

> "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant,

repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'"

*Beaudoin v. Taylor*, 492 P.2d 966, 970 (Wyo. 1972) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). *See Armstrong v. Hrabal*, 2004 WY 39, ¶ 11, 87 P.3d 1226, 1230–31 (Wyo.2004).

[¶ 33] The district court denied Foxley's motion to amend, finding, among other grounds, the amendment would be unduly prejudicial to the Ellises. Procedurally, the initial complaint was filed November 27, 2006. The initial complaint was amended for the first time on January 2, 2007. Extensive discovery ensued. On June 25, 2007, the Ellises filed their motion for summary judgment. The motion to file a second amended complaint was filed thereafter on July 30, 2007. Foxley proposed two new causes of action in this amendment. Under these particular procedural circumstances, we cannot say it was unreasonable for the district court to determine that "at some point in time the Defendants should not be required to hit a moving target."

## CONCLUSION

[¶ 34] Summary judgment was inappropriately granted in this case. The sales contract required the Ellises convey title to the property free from all encumbrances, and the warranty deed they gave Foxley stated that they delivered the property free from all encumbrances. There are common grazing rights enforceable against Foxley. Along with other material facts, the extent to which those rights encumber the property is a question of material fact yet to be determined.

[¶ 35] We cannot say the district court abused its discretion in refusing to allow them to amend their complaint. We reverse in part and affirm in part, and remand this case for further proceedings consistent with this opinion.