2012 WY 92

**Monica S. CLAMAN, Appellant (Plaintiff),**

v.

**Jean M. POPP, Appellee (Defendant).**

No. S–11–0254.

Supreme Court of Wyoming.

June 27, 2012.

Representing Appellant: Michael Stulken, Attorney at Law, Green River, Wyoming.

Representing Appellee: James K. Lubing and Leah K. Corrigan of Lubing & Corrigan, LLC, Jackson, Wyoming. Argument by Ms. Corrigan.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶1] In July 2008, Monica Claman (Claman) purchased a house in Rock Springs, Wyoming, from Jean Popp (Popp). In September 2008, Claman filed an action against Popp based on subsidence-caused defects in the house. The district court entered summary judgment against Claman on her breach of contract and negligent misrepresentation claims, and following a bench trial, it entered judgment against her on her fraudulent inducement claim. We affirm.

### ISSUES

[¶2] Claman presents the following issues on appeal:

1. Whether the trial court appropriately entered summary judgment against Appellant as to her breach of contract claim.

2. Whether the trial court appropriately entered summary judgment against Appellant as to her claim for negligence/negligent misrepresentation.

3. The legal conclusions reached by the district court as to the facts presented relating to the Appellee's claims to the Wyoming Department of Environmental Quality were improper.

### FACTS

[¶ 3] In 1970, Popp and her husband purchased a house located at 517 Walnut Street in Rock Springs, Wyoming. They lived there together until 2007, when Mr. Popp passed away. In 2008, Popp decided to sell the property so she could move to Elko, Nevada, to be closer to her son and his family.

[¶ 4] The house at 517 Walnut Street is located in an area of Rock Springs that has been designated as a subsidence area, with at least some of the subsidence in the area caused by abandoned mines that are under the jurisdiction of the Wyoming Department of Environmental Quality (DEQ). During the time that they lived at 517 Walnut Street, Popp, or Popp and her husband, submitted two claims to the DEQ Subsidence Insurance Program. Following the first claim on August 12, 1993, a DEQ claims adjuster inspected the property. The claims adjuster identified subsidence damage to the property, but he concluded that the damage was not attributable to mine subsidence and was therefore not a covered claim. He presented the subsidence damage in a list of thirteen required repairs to the home ranging in cost from a low of $25.00 and a high of $205.00, for a total cost of repair of $1,197.40.

[¶ 5] On December 14, 1993, the Department notified the Popps that their subsidence claim was denied. It explained:

> Enclosed please find a copy of Manville Claims Service claim investigation report detailing the claim on your property. The adjuster's investigation and subsequent conclusions indicate they are of the opinion that the damage to your home is the result of water saturation in the yard and under the cement as well as normal expansion and contraction cracks in the cement.
>
> Based on the investigations and reports completed by Manville Claim Service, the damage cannot be covered by the Wyoming Mine Subsidence Insurance Program. Therefore, I must advise you that your claim will be denied under the rules and regulations of the Wyoming Mine Subsidence Insurance Program. The regulations require the damage to be *mine subsidence related.* (Emphasis in original.)

[¶ 6] Popp's second DEQ claim was not a claim for damages, but was instead an application for subsidence insurance submitted in response to the following October 2, 2007, notice from the DEQ:

> The Department of Environmental Quality, Abandoned Mine Lands Division (DEQ, AML) is preparing to resume subsidence mitigation efforts of the John Park/Excelsior Mines (Tract H) as early as the week of October 8, 2007. The area of reclamation is bounded by Blair Avenue, Willow Street, Walnut Street and the South Side Belt Loop. The subsidence mitigation efforts will be completed by mass excavation of approximately 600,000 cubic yards of earthwork to expose, remove, and compact the mine workings. The work will be sequentially staged to minimize the total area of disturbance at any one time.
>
> You are receiving this notice because your residence has been identified as being within an area that may potentially be impacted by the subsidence mitigation efforts. Because your residence may potentially be impacted by the mitigation project, the project contractors will be offering to pay subsidence insurance premiums through the AML subsidence insurance program for the next two years. The contractor for this year[']s work is Coleman Construction.
>
> In order for you to receive the subsidence insurance coverage, a baseline inspection of your home will need to be conducted by an AML contractor. Please note that subsidence insurance coverage can not [sic] be provided unless a baseline inspection is conducted. . . .

[¶ 7] Popp submitted her subsidence insurance application on October 13, 2007, followed by a "Property Loss Claim Form," dated November 9, 2007. The Property Loss Claim Form identified minor existing subsidence damage to the property and noted that a report would be provided by Wilbert Engineering, Inc., the engineering firm that inspected the property pursuant to a contract with DEQ. Wilbert Engineering provided DEQ a "Pre–Policy Inspection Report" based on the firm's inspection of the Popp property on October 24, 2007. That report identified a

vertical crack in the curb of the sidewalk, several cracks in the driveway with upheaval of concrete, several cracks in the property's retaining walls, cracks and settling in the concrete patio, and sagging in the ceilings of the master bedroom and bathroom. The report described the general condition of the exterior property as "nice condition," and the interior condition as "very nice condition."

[¶ 8] In the spring of 2008, after she made the decision to sell her home, Popp hired realtor Mary Manatos of High Country Realty to assist with the sale. On April 29, 2008, in conjunction with the property listing, Ms. Manatos instructed Popp to complete a document entitled "Seller's Property Disclosure to Prospective Buyers" (Property Disclosure). Included in the questions presented by the document was the question, "Does the property or neighborhood have any known or suspected subsidence problems?" Popp answered the question by checking the box marked "yes." She did not provide additional information concerning the subsidence issues or reference the submissions to DEQ regarding the property. Also included in the questions presented by the document was the question, "Are there any structural problems with the improvements?" to which Popp responded by checking the box marked "no."

[¶ 9] Popp signed the Property Disclosure on April 29, 2008. Her signature appeared below the following acknowledgement:

The above description and statement of condition of the subject property is based on my knowledge of the property and all representations are made to the best of my current actual knowledge. I ACKNOWLEDGE AND AGREE THAT I SHALL IMMEDIATELY INFORM BUYER AND BROKER OF ANY CHANGE IN SUCH CONDITIONS THAT MAY APPEAR OR BECOME KNOWN TO ME AFTER THIS DATE. I FURTHER AGREE TO INDEMNIFY AND HOLD HARMLESS ALL BROKERS INVOLVED IN ANY SALE OF THE SUBJECT PROPERTY FROM ANY AND ALL CLAIMS, INCLUDING DAMAGES, COURT COSTS AND ATTORNEY'S FEES, ARISING FROM MY FAILURE TO COMPLETELY AND TRUTHFULLY DISCLOSE THE CONDITIONS OF MY PROPERTY AS SET FORTH ABOVE. THE INFORMATION CONTAINED IN THIS DISCLOSURE HAS BEEN FURNISHED BY SELLER. (Emphasis in original.)

[¶ 10] On April 29, 2008, Ms. Manatos listed the Popp property for sale on the Multiple Listing Service (MLS). The MLS listing provided a general description of the property and included an attached copy of the Property Disclosure. The listing described the property as a single level home with no basement and did not indicate whether the property had a crawlspace.

[¶ 11] On May 27, 2008, Claman viewed the Popp property for the first time with her own realtor, Maria Davis of Coldwell Banker Carrier Realty. Popp was present for the initial walk-through, which lasted approximately an hour. Neither Claman nor Ms. Davis asked Popp any questions concerning the property's condition during that first visit.

[¶ 12] On May 30, 2008, Claman offered to purchase the Popp property for the full asking price of $168,900.00, and Popp accepted the offer. Claman and Popp then executed on that same date a "Contract to Buy and Sell Real Estate" (Contract). The Contract specified a closing date of June 30, 2008, and authorized Claman, as the Buyer, to have the property inspected on or before June 15, 2008.

[¶ 13] Under the section of the Contract governing the property's condition, Section X.A.3 provided:

Seller represents that upon execution of this Contract:

* * * *

The condition of the property is as stated in the Property Disclosure (WAR Form 900R), an accurate and complete copy of which is attached hereto and incorporated by this reference.

Immediately following Section X.A.3, Sections X.B.1 and X.B.2 of the Contract disclaimed any Buyer reliance on Seller's representations:

Buyer acknowledges and agrees that, upon execution of this Contract:

1. Buyer is not relying upon any representations of Seller or Seller's Agents or representatives as to any condition which Buyer deems to be material to Buyer's decision to purchase this property; and

2. Buyer has been advised by Selling Broker of the opportunity to seek legal, financial, construction, air quality (such as mold), environmental (such as radon and lead-based paint) and/or professional home inspection services regarding this purchase.

[¶ 14] Under the section of the Contract governing Buyer inspections, the Contract, in Section XII.A, authorized the Buyer to obtain "electrical, mechanical, structural, air quality . . ., environmental . . ., and/or other inspections of the Property by qualified professional inspectors and/or engineers[.]" Section XII.C concluded this provision with the following waiver:

Waiver of Defects. Buyer acknowledges that Buyer has been given ample opportunity to inspect the property. Other than repairs or defects submitted to the Seller in writing pursuant to XII (A) or XI above [Lender or Appraiser Inspections], or in the event no repairs or inspections are required by Buyer, Buyer accepts the Property in its entirety in "as is, where is" condition without any implied or express warranty by Seller or by any Broker.

[¶ 15] The Contract ended with a consents and acknowledgements section, Section XVII.A, which contained the following merger clause:

All prior representations made in the negotiations of this sale have been incorporated herein, and there are no oral agreements or representations between Buyer, Seller or Brokers to modify the terms and conditions of this Contract.

[¶ 16] On June 14, 2008, Claman had the Popp property inspected by Richard Wright of Rocky Mountain Home Inspection Services. In his inspection report, Mr. Wright described the property's interior as in "good/ fair overall condition with small repairs needed." He made the following additional comments concerning the property:

—the ground is sloped toward the house in areas;

—the concrete retaining wall has cracks;

—the pavements are in fair condition with some repairs needed in the sidewalk area;

—a rafter upright in the attic is cracked and needs repaired;

—the ceilings and walls require small repairs; and

—the property "has no basement or crawl space area. An inspection could not be performed."

[¶ 17] On July 10, 2008, the parties closed on the property. Claman took possession of the property on that same date, and shortly after that, while working in her yard, Claman was visited by an individual who identified himself as Harry Moore. Mr. Moore informed Claman he was an engineer and was investigating a claim Popp had made for dynamite compaction damage. Following her conversation with Mr. Moore, Claman contacted DEQ and obtained copies of its documentation relating to the property. She thereafter hired a structural engineering firm, Reeve & Associates, Inc., to prepare a structural assessment of the property. Following its assessment of the property, Reeve & Associates submitted a report to Claman that detailed the following findings and conclusions, with the references to attached photographs omitted:

• The front wall of the residence is tilting out of plane away from the house. The concrete slab adjacent to the wall has a noticeable slope towards the exterior wall with the wall and slab sloping to a low point towards the middle of the front wall.

• The North exterior wall is tilting out of plane away from the house with the interior slab at the wall beginning to slope towards the exterior wall about 4′ to 6′ out from the wall.

• The South half of the back wall of the residence is tilting out of plane into the house.

• The East half of the South wall is bowing in and the West half of the South wall is tilting out of plane away from the house.

- The South West corner of the residence at the front entry is slumping in towards the house.
- The exterior doors on the front and back of the house do not close properly as the door jambs are no longer plumb.
- Many sections of the floor adjacent to the exterior walls abruptly slope down towards the exterior wall starting approximately 6″ from the wall indicating the wood floor in these sections has been damaged.
- The roof appears to be sound with no leaking or damage noted upon a visual inspection of the interior of the roof.
- Large silver maple stumps of approximately 24″ in diameter are in close proximity to the house. One stump is about 4′ away from the South East corner of the house with a roof drain from the adjacent property and two in the front lawn are within 13′ to 15′ of the house. A number of smaller stumps were also present in the front lawn near the house.
- The retaining walls as noted on the Uinta Engineering and Surveying, Inc. report were also reviewed. The South wall also has a large section to the East that has tilted about 15 degrees out of plane that was not noted on their report.
- There is no positive drainage for runoff away from the house on all sides and the adjacent properties drain on the North, South, and East drain onto the property as noted in Harry L. Moore's report dated May 9, 2008. The front lawn and slab slope towards the house with a low spot towards the middle of the wall. Differential settlement of the exterior slabs was also noted at the South East corner of the house.
- The floor system is composed of 2x4 floor joists at 16″ O.C. with wood planking over-sheathed with a layer of 3/4″ OSB and a layer of 1/4″ OSB. A small access to the plumbing space has been made near the master bedroom with a single wood support on a piece of OSB on the North East corner. The wood floor is suspended with an average of 2″ of clearance above a concrete slab on the West side of the access, and an average of 2″ of clearance above the soil on the East side of the access. The floor joists appear to come into contact with the ground and sections of slab at the perimeter of the residence. Any wood in the floor system in contact with concrete or soil that is not preservative-treated or redwood shall be considered damage. As there were no visible markings on the wood joists and the deflection of the floor around the perimeter of the residence, we must assume that the wood floor system has been damaged along the entire perimeter of the residence.
- The existing slab-on-grade has been busted up at the access point to expose some of the plumbing. The slab edge has also been undermined by up to 6″ with the soil grade under the exposed sections of the slab forming a shallow point near the center of the residence. The slab also bows down towards the center of the residence at a shallower angle than the soil it is suspended over.

From our investigation, we have concluded that there are three possible causes of damage to the foundation. They are as follows with their corresponding probabilities:

1. Frost heave settlement—high probability. Due to the negative (i.e. towards the structure) drainage around the house, the shallow point in the soil below the residence, and lack of adequate frost protection, settlement may have occurred due to water penetration under the foundation and subsequent frost heave from water under the uninsulated shallow foundation.

2. Close vegetation proximity—high probability. Due to the close proximity of the silver maple trees to affected areas of the foundation, it appears that the foundation has been damaged by the tree roots undermining the foundation. The silver maple tree has a shallow root system that can extend up to and past the branch diameter of 40′ and has been known to break through foundation walls.

3. Mine subsidence settlement—low probability. Due to the proximity to abandoned mine tunnels in the area, settlement due to active mine subsidence is possible but not probable because the structure is

six blocks away from the site of the State of Wyoming dynamic compaction project. From our conclusions, we recommend that foundation insulation and a perimeter drain be installed around the residence to prevent further damage to the structure. We also recommend the existing wood flooring be replaced with a 4″ concrete slab or the wood floor joists be supported at 5′– 0″ O.C. with proper clearance between the soil and the joists to prevent further deterioration.

[¶ 18] On September 10, 2008, Claman filed a Complaint against Popp alleging claims for breach of contract, negligent misrepresentation, and fraudulent inducement. Claman's specific allegations were that the property was not in the condition represented by the Property Disclosure, and, in particular, the foundation was "completely broken." Claman alleged she would not have purchased the home if she had been informed of the defects or if she had been informed of the submissions to the DEQ concerning property subsidence. Through her Complaint, Claman sought damages of $300,000 to correct the property's structural defects, or, in the alternative, rescission of the Contract.

[¶ 19] On December 17, 2009, Claman filed an Amended Complaint, adding Richard Wright and Rocky Mountain Home Inspection Services as defendants. Claman eventually settled her claims against the inspector and his company, leaving only her claims against Popp. On October 1, 2010, Popp moved for summary judgment on all of the claims, and on February 14, 2011, the district court entered an Order Granting Partial Summary Judgment. In granting partial summary judgment, the district court found no breach of contract based on the Contract's merger clause and on its provision disclaiming any buyer reliance on seller representations. The court granted summary judgment on Claman's negligent misrepresentation claim based on the same Contract provisions, ruling that the Contract's merger and disclaimer clauses barred a claim for negligent misrepresentation. The court found issues of material fact existed on the question of fraudulent inducement, and it thus denied summary judgment on that claim.

[¶ 20] The district court held a bench trial on the fraudulent inducement claim on June 21 and 22, 2011, and on July 7, 2011, it issued its Findings of Fact, Conclusions of Law, and Order rejecting the claim and finding in favor of Popp. Claman thereafter appealed the Order Granting Partial Summary Judgment and the Findings of Fact, Conclusions of Law, and Order.

### STANDARD OF REVIEW

[¶ 21] We consider the district court's rulings on Claman's breach of contract and negligent misrepresentation claims under our summary judgment standard of review. Motions for summary judgment come before the trial court pursuant to Rule 56(c) of the Wyoming Rules of Civil Procedure, which provides that

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Formisano v. Gaston,* 2011 WY 8, ¶ 3, 246 P.3d 286, 288 (Wyo.2011). We review a grant of summary judgment as follows:

We review a summary judgment in the same light as the district court, using the same materials and following the same standards. [*Snyder v. Lovercheck,* 992 P.2d 1079, 1083 (Wyo.1999) ]; · *40 North Corp. v. Morrell,* 964 P.2d 423, 426 (Wyo. 1998). We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.* If the moving party presents supporting summary judgment materials demonstrating no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials posing a genuine is-

sue of a material fact for trial. *Roberts v. Klinkosh*, 986 P.2d 153, 155 (Wyo.1999); *Downen v. Sinclair Oil Corp.*, 887 P.2d 515, 519 (Wyo.1994). We review a grant of summary judgment deciding a question of law de novo and afford no deference to the district court's ruling. *Roberts v. Klinkosh*, 986 P.2d at 156; *Blagrove v. JB Mechanical, Inc.*, 934 P.2d 1273, 1275 (Wyo.1997).

*Lindsey v. Harriet*, 2011 WY 80, ¶ 18, 255 P.3d 873, 880 (Wyo.2011).

 [¶ 22] Because Claman's fraudulent inducement claim was tried to the court, we apply the following standard of review:

Following a bench trial, this court reviews a district court's findings and conclusions using a clearly erroneous standard for the factual findings and a *de novo* standard for the conclusions of law. *Piroschak v. Whelan*, 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005).

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Piroschak*, ¶ 7, 106 P.3d at 890. Findings may not be set aside because we would have reached a different result. *Harber v. Jense [Jensen]*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004). Further,

we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Id.*

*Pennant Service Co., Inc. v. True Oil Co., LLC*, 2011 WY 40, ¶ 7, 249 P.3d 698, 703 (Wyo.2011) (quoting *Hofstad v. Christie*, 2010 WY 134, ¶ 7, 240 P.3d 816, 818 (Wyo.2010)) (some citations omitted). We review the district court's conclusions of law *de novo*. *Lieberman v. Mossbrook*, 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo.2009).

 [¶ 23] When summary judgment is entered based on interpretation of a contract, the following standard of review applies:

The initial question of whether the contract is capable of being understood in only one way is a question of law for the court. If the court determines that the contract is capable of being understood in only one way, then the language used in the contract expresses and controls the intent of the parties. In such case, the next question, what is that understanding or meaning, is also a question of law. When we review the district court's summary judgment decisions that a contract is capable of being understood in only one way and what that understanding is, we accord no deference to those decisions.

*Union Pacific Railroad Co. v. Caballo Coal Co.*, 2011 WY 24, ¶ 13, 246 P.3d 867, 871 (Wyo.2011) (quoting *M & M Auto Outlet v. Hill Inv. Corp.*, 2010 WY 56, ¶ 12, 230 P.3d 1099, 1104 (Wyo.2010)).

## DISCUSSION

### A. Breach of Contract Claim

[¶ 24] Claman asserts that Popp breached the parties' Contract by failing to disclose the property's structural defects. She contends this failure occurred both in Popp's negative response to the Property Disclosure's question concerning structural problems and in Popp's failure to disclose subsidence claims that had been submitted to the DEQ. The district court rejected Claman's breach of contract argument. Based on the court's interpretation of the Contract's language, which it found to be unambiguous, the court concluded:

Regardless of whether any disclosure was made by Defendant, there is no issue of fact over whether Plaintiff contracted to **not** rely upon any representation by Defendant. Summary judgment is granted on the breach of contract claim. (Emphasis in original.)

[¶ 25] On appeal, Claman argues the district court erred in finding the Contract's language unambiguous. She contends that conflicting Contract provisions, and the parties' disagreement over the meaning of those provisions, create an ambiguity and a question of material fact precluding summary judgment.

[¶ 26] In keeping with our settled rules of contract interpretation, we begin our analysis of any contract with the document's plain language. *Hunter v. Reece,* 2011 WY 97, ¶ 17, 253 P.3d 497, 501–02 (Wyo. 2011).

> [T]he words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co. v. Insurance Corp. of America,* 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.* [*v. Texaco* ], 882 P.2d [212,] 220 [ (Wyo.1994) ]; *Prudential Preferred Properties* [*v. J and J Ventures* ], 859 P.2d [1267,] 1271 [ (Wyo.1993) ]. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.,* 929 P.2d 535, 539 (Wyo.1996).

*Hunter,* ¶ 17, 253 P.3d at 502 (quoting *Amoco Prod. Co. v. EM Nominee Partnership Co.,* 2 P.3d 534, 540 (Wyo.2000)).

[¶ 27] "When contractual language is clear and unambiguous, the interpretation and construction of contracts is a matter of law for the courts." *Hunter,* ¶ 18, 253 P.3d at 502 (quoting *Thorkildsen v. Belden,* 2011 WY 26, ¶ 8, 247 P.3d 60, 62 (Wyo. 2011)). Whether a contract is ambiguous is a matter of law for the court to decide, and disagreement among the parties to a contract as to the contract's meaning does not mean that contract is ambiguous. *Ultra Re-*

*sources, Inc. v. Hartman,* 2010 WY 36, ¶ 23, 226 P.3d 889, 905 (Wyo.2010). Because we use an objective approach to interpret contracts, evidence of the parties' subjective intent is not relevant or admissible in interpreting a contract. *Hunter,* ¶ 16, 253 P.3d at 501.

[¶ 28] Our rules of interpretation require that we interpret a contract as a whole, reading each provision in light of all the others to find their plain meaning. *Arnold v. Ommen,* 2009 WY 24, ¶ 40, 201 P.3d 1127, 1138 (Wyo.2009); *see also Caballo Coal Co. v. Fid. Exploration & Prod. Co.,* 2004 WY 6, ¶ 11, 84 P.3d 311, 314–15 (Wyo.2004). We presume each provision in a contract has a purpose, and we avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless. *Scherer v. Laramie Reg'l Airport Bd.,* 2010 WY 105, ¶ 11, 236 P.3d 996, 1003 (Wyo.2010).

[¶ 29] Using these rules of interpretation, we turn to Claman's argument on appeal. Claman's specific contention is that the Contract's Property Disclosure provision conflicts with the Contract's provision disclaiming any buyer reliance on seller representations and its warranty disclaimer provisions. She argues that the conflicting contract language, coupled with the parties' disagreement over which provision should control, means the Contract is ambiguous. As we noted above, the parties' disagreement as to the meaning of a contract's language does not alone render that contract ambiguous. *See Ultra Resources, Inc.,* ¶ 23, 226 P.3d at 905. Instead, we must consider the Contract as a whole and the relationship between each of its provisions, and only if the Contract's plain meaning cannot be determined do we find the Contract to be ambiguous.

[¶ 30] This Court has on a number of occasions interpreted real estate contracts containing merger clauses and disclaimers acknowledging that the buyer is not relying on representations by the seller. We have explained the meaning and effect of such provisions as follows:

> When purchasers of realty sign contracts with disclaimers and merger clauses stat-

ing that the purchaser is not relying on the representations of the sellers or their agents as to the condition of the property, the contract has allocated the risks of loss resulting from the purchaser's reliance on the seller's representations to the purchaser.

*Hulse v. First American Title Co. of Crook Cty.*, 2001 WY 95, ¶ 54, 33 P.3d 122, 139 (Wyo.2001); *see also Foxley & Co. v. Ellis*, 2009 WY 16, ¶ 21, 201 P.3d 425, 431 (Wyo. 2009) (non-reliance clause placed risk of non-disclosure on buyer); *Snyder v. Lovercheck*, 992 P.2d 1079, 1089 (Wyo.1999) ("The contract clearly and unambiguously states that [Buyer] is not relying on any representations made by [Seller]. This clause validly allocates the risk of loss resulting from [Buyer's] reliance on [Seller's] representations.").

[¶ 31] We have also considered the meaning and effect of an "as is" clause in a real estate contract, holding that "absent an allegation of fraud, an 'as is' clause bars a claim for nondisclosure." *Richey v. Patrick*, 904 P.2d 798, 804 (Wyo.1995).

> [W]hile the "as is" clause is not a complete bar to these causes of action, its effect is to put the burden upon a buyer to determine the condition of the property purchased. [*Omernik v. Bushman*, 151 Wis.2d 299, 444 N.W.2d 409 (1989).] This shifting of the burden, with nothing more [*i.e.*, misrepresentations or fraud], protects a seller and his or her agent from claims premised upon nondisclosure.

*Richey*, 904 P.2d at 803 (quoting *Grube v. Daun*, 173 Wis.2d 30, 496 N.W.2d 106, 117 (App.1992)); *see also Hulse*, ¶ 53, 33 P.3d at 138–39 (contract's "as is" clause "placed the risk of discovery of adverse material facts" on buyer).

[¶ 32] The plain meaning of the Contract's "as is," merger, and disclaimer provisions is thus clear. The provisions place the responsibility for discovering adverse material facts concerning the property on the buyer, and likewise place the risk of loss for those adverse material facts on the buyer. The next task then is to determine whether the Contract's Property Disclosure provision somehow alters that plain meaning. To answer this question, we must determine the meaning of the Property Disclosure provision.

[¶ 33] The Contract's Property Disclosure provision states, "Seller represents that upon execution of this Contract ... [t]he condition of the property is as stated in the Property Disclosure." Before addressing the purpose of this provision, we will address what we know the provision is not. We know the provision is not a warranty because the Contract's plain language clearly and specifically disclaims any seller warranties, express or implied, concerning the property's condition. The Property Disclosure itself confirms this interpretation. The document's front page specifies that it is "Seller's Property Disclosure to Prospective Buyers," and the document describes itself as a "statement and representation" disclosing designated conditions "to the best of Seller's current actual knowledge." The Property Disclosure details the Seller's knowledge of the property, but it contains no language that could be interpreted as a warranty or promise, assurance or guarantee of any type.

[¶ 34] The Property Disclosure's incorporation into the Contract does not change or elevate the document's status. The Property Disclosure is by its own description and by the Contract's terms a representation by the seller. The sentence immediately following the Property Disclosure's incorporation into the Contract then specifies that the buyer is not relying on the seller's representation as to any condition the buyer deems material to her decision to purchase the property. The Property Disclosure thus cannot by its own terms or by its incorporation into the Contract be interpreted as a guarantee, promise or warranty of the property's condition.

[¶ 35] The final question then is what meaning to give the Contract's Property Disclosure provision. The Contract provision sets forth two options concerning Property Disclosure: option A specifies that the condition of the property is as stated in the attached and incorporated Property Disclosure form, and option B specifies that a Property Disclosure is not available. Given its immediate proximity to the buyer's disclaimer of reliance on any seller representa-

tion, and to the provisions advising of the buyer's opportunity to seek legal and technical advice, including professional home inspection services, we conclude the Property Disclosure provision is simply notice that a Property Disclosure form setting forth the seller's current actual knowledge is available. The buyer may use the Property Disclosure as she wishes during the time period before closing on the property, including in obtaining legal, technical or professional inspection services, or, of course, not at all. What the Contract bars by its clear terms, however, is holding the Property Disclosure forth as a representation of conditions the buyer deemed material to her decision to purchase the property.

[¶ 36] We thus conclude that the Contract is unambiguous, and based on its plain meaning, Claman may not assert a breach of contract claim based on the accuracy of any representation by Popp or any nondisclosure by Popp, or Claman's reliance on the alleged representation or nondisclosure.

**B.** *Negligent Misrepresentation Claim*

▮ [¶ 37] Claman's second cause of action against Popp was a negligent misrepresentation claim. Claman asserted that Popp undertook to make property condition disclosures and in doing so assumed a duty to "fully, accurately, and completely" disclose her prior knowledge of any defects in the property. Claman argues that Popp breached that duty by not disclosing the claims submitted to the DEQ concerning the property's subsidence damage.

[¶ 38] The district court granted summary judgment against Claman's negligent misrepresentation claim, ruling that the Contract's merger and disclaimer provisions barred the claim. On appeal, Claman argues that the court erred because the Contract's Property Disclosure provision distinguishes this case from those on which the district court relied. We disagree.

[¶ 39] This Court has repeatedly held that when a purchaser of realty signs a contract with disclaimer and merger clauses providing that the purchaser is not relying on the representations of the seller as to the condition of the property, the contract bars a claim for negligent misrepresentation. *Hulse*, ¶ 54, 33 P.3d at 139; *Sundown, Inc. v. Pearson Real Estate Co., Inc.*, 8 P.3d 324, 332 (Wyo.2000); *Snyder*, 992 P.2d at 1089. We have explained:

> Tort law proceeds from a long historical evolution of externally imposed duties and liabilities. Contract law proceeds from an even longer historical evolution of bargained-for duties and liabilities. The careless and unnecessary blanket confusion of tort and contract would undermine the carefully evolved utility of both.
>
> In tort, the legislatures and the courts have set the parameters of social policy and imposed them on individual members of society without their consent. The social policy in the field of contract has been left to the parties themselves to determine, with judicial and legislative intervention tolerated only in the most extreme cases. Where there has been intervention, it has been by the application of well established contract doctrines, most of which focus on threats to the integrity of the bargaining process itself such as fraud or extreme imbalance in bargaining power.

*Hulse*, ¶ 54, 33 P.3d at 139 (quoting *Snyder*, 992 P.2d at 1087).

▮ [¶ 40] As we noted above in our discussion of Claman's breach of contract claim, the Contract's Property Disclosure provision is simply a notice provision. The provision did not alter or dilute in any fashion the Contract's merger and disclaimer provisions, and it did nothing to undermine the policy justifications for not allowing a tort claim to nullify the parties' bargained for allocation of risk. *See Snyder*, 992 P.2d at 1087 ("[P]arties are not permitted to assert actions in tort in an attempt to circumvent the bargain they agreed upon."). We thus affirm the district court's entry of summary judgment rejecting Claman's negligent misrepresentation claim.[1]

---

1. Even if we were to conclude that the Contract does not bar the negligent misrepresentation claim, we would nonetheless uphold the district court's summary judgment ruling. Wyoming does not recognize a claim for negligent nondisclosure, and because no representation is made

## C. *Fraudulent Inducement Claim*

[¶ 41] Claman's final claim for relief was a fraudulent inducement claim, which she based on two alleged fraudulent acts by Popp. First, Claman alleged that Popp intentionally withheld information concerning the 1993 and 2007 DEQ submissions with the intention of inducing Claman to purchase the property. Second, she alleged that Popp intentionally misrepresented to Claman that the property did not have a crawlspace in an effort to conceal the failing foundation.

[¶ 42] Following a bench trial, the district court ruled against Claman on both allegations of fraud. With respect to the allegation relating to the crawlspace, the court found Popp's testimony more credible than that of Claman, and it concluded that Popp had in fact informed Claman of the crawlspace and offered to show her the crawlspace. On appeal, Claman does not challenge the district court's findings on the crawlspace allegation. Claman instead appeals only the ruling on the fraud allegations relating to Popp's failure to disclose the DEQ claims.

[¶ 43] A plaintiff alleging fraudulent inducement carries the burden of showing by clear and convincing evidence that 1) the defendant made a false representation intending to induce action by the plaintiff; 2) the plaintiff reasonably believed the representation to be true; and 3) the plaintiff suffered damages in relying on the false representation. *Bitker v. First Nat'l Bank in Evanston*, 2004 WY 114, ¶ 12, 98 P.3d 853, 856 (Wyo.2004). "Clear and convincing evidence is the 'kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.'" *Alexander v. Meduna*, 2002 WY 83, ¶ 29, 47 P.3d 206, 216 (Wyo.2002) (quoting *MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830, 839 (Wyo. 1980)).

> Conduct or words which tend to produce an erroneous impression may satisfy the plaintiff's burden. *In addition, even if someone is not under a duty to speak, if he does speak, he is under a duty to speak truthfully and to make a full and fair disclosure.* Reliance is reasonable when false representations have occurred prior to the execution of the contract which is sought to be avoided or for which damages are sought to be recovered.

*Alexander*, ¶ 25, 47 P.3d at 215 (quoting *Sundown, Inc.*, 8 P.3d at 330–31) (emphasis in original).

[¶ 44] Applying these principles to Claman's allegation that Popp fraudulently failed to disclose the 1993 and 2007 DEQ submissions, the district court rejected the claim based on the following conclusions (citations to trial exhibits omitted):

> Plaintiff has not demonstrated by clear and convincing evidence that Defendant committed fraud when Defendant did not reveal that she made the 1993 and the 2007 claims. There was no demonstration that Defendant made a false representation intended to induce action by Plaintiff. Even though Defendant admitted that she did not reveal the claims to Plaintiff, or even to her own real estate agent, Defendant testified that she intended to disclose the property's subsidence issues when she checked the affirmative box on the disclosure statement. The Parties' contract to buy specified that Plaintiff was "not relying upon any representation of Seller ... as to any condition" that she deemed material to her decision to purchase the property. Likewise, the contract indicated that Plaintiff was accepting the property "in its entirety in 'as is, where is' condition." The evidence does not support a finding that it was reasonable for Plaintiff to rely upon Defendant's representations as a disclosure of every issue necessary for Plaintiff to consider before closing on the house.
>
> Both real estate agents testified that the seller had no duty to expound on the information provided in the property disclosure statement. Mary Manatos said that in her work as a real estate agent, she had seen some disclosure statements with many comments, some without any additional comments, and some were waived altogeth-

in the case of a nondisclosure, a nondisclosure cannot support a claim for negligent misrepresentation. *Throckmartin v. Century 21 Top Realty*,

2010 WY 23, ¶ 26, 226 P.3d 793, 808 (Wyo.2010); *Sundown, Inc.*, 8 P.3d at 332.

er. Ms. Manatos testified that even if the disclosure statement exposed every problem with the house, the buyer still would have had the duty to have an appropriate inspection of the house to make sure she would be getting what she paid for. Although Defendant was not required to complete the property condition statement, because she did complete it, she was under a duty to speak truthfully and to make a full and fair disclosure. By checking "yes" under the question of whether the house was in a subsidence area, Defendant made a truthful, full, and fair disclosure of the conditions necessary for which Plaintiff should have been aware. Even though the claims had not been specifically disclosed, the completion of the property disclosure statement was based upon Defendant's "knowledge of the property" with representations made to the best of her "current actual knowledge."

It was the revelation of the location of the house in a subsidence area, rather than the 1993 and 2007 claims, which if not revealed, could have conceivably misled Plaintiff into damages. Ultimately, the concealed subsidence and dynamic compaction claims did not result in the damages that Plaintiff alleges. Plaintiff argues that if she had known of the claims, she would have backed out of closing on the house and would have been saved the headache of owning a structurally damaged house. Both Plaintiff and Defendant testified that the structural damage to the house was not related to the subsidence or compaction issues.

The evidence indicates that the clues of structural damage to the house were visible even though the 1993 and 2007 claims were hidden. For example, grouting work was being done on nearby properties around the time Plaintiff began visiting 517 Walnut. Similarly, Rick Wright's inspection report acknowledged the cracked walkways, the cracked retaining wall, and that the yard sloped toward the house. These issues, interestingly, reflect some of the condition issues raised by the 1993 and 2007 claims. Additionally, Mr. Wright's inspection revealed that a rafter support beam in the attic was cracked and required

repair. He testified that the cracked rafter support could have indicated structural damage, but not necessarily so. Plaintiff testified that during her many visits to the house, Defendant would discuss the house including the drainage issues coming from nearby Pine Street. Defendant testified that during one of Plaintiff's visits, Defendant pointed out to Plaintiff a sunken portion of the patio and warned Plaintiff to make sure her chair did not slip into it. Defendant remembered Plaintiff commenting that she knew people who could fix that sort of thing. The evidence indicates that Plaintiff could have been alerted to potential problems without knowing about the 1993 and 2007 claim, which would have notified her to hire a structural engineer to inspect the property. Defendant's omission of information about the 1993 and the 2007 claims was not a misrepresentation intended to induce action by Plaintiff and did not result in damages to Plaintiff.

\* \* \* \*

Plaintiff has not demonstrated by clear and convincing evidence that Defendant committed fraud in not revealing that she had made the 1993 and 2007 claims with the DEQ. There has been no demonstration that Defendant made a false representation intended to induce action by Plaintiff, that it was reasonable for Plaintiff to rely upon such a representation, or that the representation resulted in damages to Plaintiff. Likewise, Plaintiff has not demonstrated by clear and convincing evidence that Defendant committed fraud as to the presence of the crawlspace. Not only did the evidence indicate that Defendant offered to show Plaintiff the entrance to the crawlspace but also that Defendant did not know that an examination of the crawlspace would have exposed the house's structural damage. Plaintiff has not met her burden of demonstrating, by clear and convincing evidence, intentional misrepresentation or fraud.

[¶ 45] On appeal, Claman does not challenge the evidentiary basis for the district court's conclusions, but instead, in her brief, argues:

Because the Appellee took on this obligation of full, fair, and complete disclosure,

the Appellant should not have had to look for "clues" as to the complaints relating [to] the Wyoming Department of Environmental Quality claims. Instead, the Appellee should have made full and truthful disclosure relating to these claims so that the Appellant would have had an opportunity to weigh her options relating to the claims before closing on the residence. Claman's argument misunderstands the showing required to prove a claim for fraudulent inducement and the import of the district court's findings.

[¶ 46] The court's findings and conclusions illustrate first that Popp's failure to disclose the DEQ claims was not motivated by a fraudulent intent. Simply put, the court concluded that Popp was not trying to hide a latent defect. On the Property Disclosure, Popp reported that the property had known or suspected subsidence problems. And the subsidence problems reported in the DEQ claim forms were not latent defects that could be learned only from reviewing those forms. The DEQ submissions revealed drainage issues, issues that the court found Popp had disclosed and were otherwise apparent, and they revealed minor repairs that were required to the property, repairs that cost less than $1,200.00. The forms did not disclose anything that would suggest the home's foundation was failing and would require the $300,000.00 in repairs Claman has demanded. Based on Popp's affirmative disclosure of the property's subsidence problems, the open indicators of the subsidence problems covered by the DEQ claims, and the district court's determination that Popp was a credible witness, the court concluded

that Popp did not know of the failing foundation and had no intent to misrepresent the property's condition by not disclosing the DEQ claims.

[¶ 47] The district court's findings also undercut Claman's allegation of reliance on the nondisclosure and her allegation that her damages were caused by that reliance. This Court has held that a contract's "as is" disclaimer provision will not bar a claim for fraudulent nondisclosure. *Richey*, 904 P.2d at 803–04. Nonetheless, a buyer of property cannot ignore available evidence of a defect, such as physical evidence on the property and the seller's property condition disclosures, and then assert a claim for fraud because the same information was not provided in a different form. Under these circumstances, the evidence does not support a claim of reliance on the nondisclosure.

## CONCLUSION

[¶ 48] The district court's summary judgment against Claman's breach of contract and negligent misrepresentation claims was in accordance with law and the undisputed facts. We also conclude that the court's findings of fact on Claman's fraudulent inducement claim were not clearly erroneous and its conclusions and order were in accordance with law. We thus affirm.