2010 WY 105

**Robert L. SCHERER, II, Appellant (Defendant),**

v.

**LARAMIE REGIONAL AIRPORT BOARD, Appellee (Plaintiff).**

No. S–09–0196.

Supreme Court of Wyoming.

July 30, 2010.

Representing Appellant: Theodore C. Preston of Prehoda, Leonard & Edwards, LLC, Laramie, Wyoming.

Representing Appellee: Matthew F.G. Castano of Brown & Hiser LLC, Laramie, Wyoming.

Before KITE, C.J., and GOLDEN, HILL, VOIGT,* BURKE, JJ.

GOLDEN, Justice.

[¶1] Robert L. Scherer, II, (Scherer) appeals the judgment of the district court, entered after an unreported bench trial, that awarded Laramie Regional Airport Board (Board) $88,112.97 on its complaint that Scherer had breached paragraph 19 of the parties' lease agreement which required Scherer to "keep the leased premises and adjacent area clean, orderly, and free of accumulated trash at his own expense." We affirm.

## STATEMENT OF THE ISSUES

[¶2] In Scherer's principal brief, he presents these issues:

1. Did the District Court err by shifting the cost of removing the Quonset hut to

* Chief Justice at time of expedited conference.

Mr. Scherer despite passage of the deadline set forth in paragraph 10?

2. Did the District Court err as a matter of law in finding that Mr. Scherer was responsible to return the leased premises to its pre-lease condition?

3. Did the District Court err in identifying the pre-lease condition of the leased premises?

In reply, the Board states the issue is whether the district court erred in finding that Scherer breached the terms of the lease and in awarding damages to the Board.

■ [¶ 3] Scherer filed a reply brief which failed to comply with the requirements of W.R.A.P. 7.03, namely, "the reply brief shall precisely and concisely set forth on the first page those new issues and arguments raised by the brief of the appellee which are addressed in the reply brief. A reply brief is limited to such new issues and arguments...." We refuse to consider Scherer's reply brief. W.R.A.P. 1.03.

## FACTS

[¶ 4] In the mid–1980s, Scherer purchased a Quonset hut[1] from the Board. On January 1, 1986, the parties executed a 20–year lease of the land underlying the hut which is located on Brees Field Airport near Laramie, Wyoming. The provisions of the lease which are pertinent to this appeal are the following:

### *LEASE EXPIRATION*

9. Within one (1) year before the expiration of the term of this agreement, the parties may negotiate in good faith a new agreement.

10. In the event a new lease is not entered into, the structure located upon the lands leased herein by Lessee shall:

(a) Be removed by Lessee at his own expense within sixty (60) days of the expiration of the term of this agreement, with the understanding that weather may require an extension of time. In the event of any removal of improvements, the premis-

es must be left clean, orderly and as close to the original condition as reasonably possible. Provided, however, that Lessee shall not remove any permanent improvement such as a floor upon which the building sits, plumbing, electrical lines or other utility without Lessor's approval.

(b) If any building improvements are not disposed of as provided above, to the extent permitted by applicable law, they shall revert to and absolute title shall vest in Lessor. After the title vests in Lessor, Lessor in its sole discretion, may remove the structure within sixty (60) days, understanding that weather may require an extension of time, at the expense of Lessee.

* * * *

19. Lessee shall keep the leased premises and adjacent area clean, orderly, and free of accumulated trash at his own expense.

[¶ 5] During the first two years of the lease term, Scherer operated an air freight business on the property; during the remaining years of the lease term, he used the hut as storage space. The parties did not renew the lease, and it expired on December 31, 2005. Although paragraph 10(a) of the lease stated that if the parties did not enter into a new lease Scherer shall remove the hut at his own expense within sixty days of the expiration date, Scherer did not remove the hut and continued to use it as a storage facility. Although paragraph 10(b) of the lease stated that if Scherer did not remove the hut at his own expense within sixty days of the expiration date then the hut shall revert to and title shall vest in the Board and then the Board may remove the hut at Scherer's expense within sixty days, the Board did not remove the hut.

[¶ 6] In September 2006, the Board served Scherer with a Notice to Quit the premises, but Scherer did not quit the premises. The parties' attempts to resolve the situation bore no fruit. In a letter dated December 28, 2006, the Board informed Scherer that it possessed title to the hut, that it was entitled to remove it at his expense,

---

1. Trademark. A semi-cylindrical metal shelter having end walls. *Random House Webster's Col-* *lege Dictionary* 1108 (1992).

that it intended to remove it, and that he should contact the Board if he wanted to remove it himself. In January and February 2007, the parties continued to try to resolve the situation, but to no avail. Between early 2007 and July 2007, Scherer began cleaning his property out of the hut, but had made only limited progress.

[¶ 7] In early July 2007, the Board contacted an engineering and surveying company to assist in removing the hut from the airport property. That company enlisted the help of an industrial hygienist to ensure that the removal was done in a safe manner. Upon inspection of the hut, the industrial hygienist found that the hut had fallen into considerable disrepair during the lease term. During Scherer's occupancy, the hut's windows and skylights had been broken and not repaired. This condition allowed the hut to be occupied by a number of animals, including pigeons. The Board, the engineering firm, and the industrial hygienist developed a plan for removing the hut in light of the hut's poor condition and the danger posed by pigeon feces. The Board advertised for bids and accepted the lowest one; demolition began in October 2007 and was completed by early November 2007.

[¶ 8] On August 1, 2008, the Board filed its complaint against Scherer for breach of the covenants in the lease and damages of $90,504.89 for the cost of restoring the leased property. The allegations of the complaint pertinent to this appeal include paragraphs 10, 11, and 12. Paragraph 10 alleged that Scherer had failed to restore the property within sixty days after surrender of the leased premises in accordance with paragraph 10 of the lease. Paragraph 11 alleged that when Scherer surrendered the lease the property was in a poor and dangerous condition because of Scherer's acts of omissions during the period of his tenancy. Paragraph 12 alleged that Scherer breached the covenants of the lease by surrendering the leased property in the poor and dangerous condition as described.

[¶ 9] The parties tried the case before the district court on August 4, 2009. The trial was not reported; therefore, no transcript of the trial exists; and the parties have not submitted a statement of the evidence or proceedings. W.R.A.P. 3.03. The district court issued its decision letter on August 10, 2009, and its judgment which incorporated that letter on August 21, 2009. The following excerpt from the district court's decision letter explains that court's ruling in favor of the Board:

## DISCUSSION

LRAB seeks recovery under three legal theories: breach of contract, promissory estoppel, and equitable estoppel.

### I. Breach of Contract

LRAB first seeks recovery under a breach of contract theory under the terms of the parties' lease agreement. "The elements for a breach of contract claim consist of a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages." *Reynolds v. Tice*, 595 P.2d 1318, 1323 (Wyo.1979).

#### A. Lawfully Enforceable Contract

In the instant case, the parties agreed that a lawfully enforceable contract existed in the form of their lease agreement. *Stipulation as to Facts Not Disputed at Trial*, at 1 (filed Aug. 3, 2009).

#### B. Breach

The parties focused the evidence and their arguments on the provisions set forth above concerning the parties' remedies available upon the expiration of the lease. Those provisions, paragraphs 9 and 10 of the Lease, are unambiguous and the Court finds that Mr. Scherer did not breach his duties under those provisions. In fact, Mr. Scherer had no duties under those provisions. Paragraph 10(a) allowed him 60 days after the lease expired to remove the Quonset hut from the airport land at his expense. Failing that, paragraph 10(b) transferred ownership of the building to LRAB and allowed it 60 days to remove the building at Mr. Scherer's expense. These lease provisions do not require either party to take affirmative action, though. Thus, when Mr. Scherer failed to remove the Quonset hut within 60 days of

the lease's expiration, title vested in LRAB. LRAB could then do whatever it desired with the building, but could only remove it at Mr. Scherer's expense if it did so within 60 days of receiving title. The parties agreed that neither took any action regarding the building within its respective 60–day period. Therefore, at the end of 120 days after the lease's expiration, LRAB owned the Quonset hut, but could no longer force Mr. Scherer to pay for its removal under the lease provision primarily at issue here.

The Court, however, does find that Mr. Scherer breached the Lease. LRAB contended in its *Complaint:*

> 11. When [Mr. Scherer] surrendered the leased premises said premise (sic) was in a poor and dangerous condition due to the acts of omission of [Mr. Scherer] during the period of the tenancy. The property at the time of surrender contained a wide variety of items that were not placed or located in any organized or apparently usable fashion. Furthermore, the floor and other surfaces of the open shop portion of the building and the upper level of the building, which comprised most of the building floor area, were covered with significant quantities of pigeon feces such that walking through these portions of the building without walking on pigeon feces was not possible. Several openings in the structure through which pigeons and other birds could enter and exit the building at will were noted.
>
> 12. The surrender of the leased premises in the condition described above was a breach by [Mr. Scherer] of the covenants in the lease.

*Complaint,* at 2–3 (filed Aug. 1, 2008). Specifically, Mr. Scherer breached paragraph 19 of the Lease, which provides:

> [Mr. Scherer] shall keep the leased premises and adjacent area clean, orderly, and free of accumulated trash at his own expense.

Plaintiff's Exhibit 1, "Lease," at 5.

The evidence presented at trial clearly shows that Mr. Scherer failed to keep the property clean, orderly, and free of accumulated trash. At trial, Mr. Scherer testified that several skylights and windows were broken and that the front door had patched holes where the airport's snow remover inadvertently "punched" holes through the door several years earlier. *See* Defendant's Exhibit D. At closing, Mr. Scherer admitted to his "lack of diligence" in taking any affirmative action regarding the building throughout his leasehold.

Of course, LRAB's primary concern was the large quantity of pigeon excrement contaminating the interior of the Quonset hut. *See* Plaintiff's Exhibits 9–11. The dangers posed by pigeon feces and the care which had to be exercised at its cleanup are obvious in Dr. James Dennison's "work plan":

> A substantial amount of pigeon excrement exists in the Quonset hut, and needs to be cleaned up prior to demolition of the building. Pigeon excrement often contains biological agents which can cause serious health effects, including the bacteria *Histoplasma capsulatum* and the fungus *Cryptococcccus neoformans.* When pigeon excrement is observed, standard practice is to assume it is contaminated with these agents and to follow established precautions handling it, as sampling the waste for the biological agents is impractical.

Plaintiff's Exhibit 8, "Pigeon Waste Cleanup," at 1. Numerous pigeons gained entrance to the interior of the building through the broken skylights and the large quantity of feces followed thereafter.[1]

--------

1: Mr. Scherer testified that when he began organizing the building's contents in February 2007 in preparation of cleaning it up, he did not "notice" a large amount of pigeon excrement. However, the Court finds the pictures entered into evidence along with Dr. James Dennison's "work plan" to be more credible indicators of the serious quantity of bird feces inside the Quonset hut.

Thus, LRAB has established that Mr. Scherer breached the lease agreement by failing to keep the premises clean, orderly, and free of accumulated trash as shown by the building's general disrepair and the pigeon excrement coating its interior.

Though Mr. Scherer owned the Quonset hut during the lease term, and he could theoretically do with it as he pleased (including allowing it to fall into disrepair), the Lease contemplated potential transfer of the building to LRAB following expiration of the Lease. Therefore, the provision requiring Mr. Scherer to keep the building clean, orderly, and free of accumulated trash was reasonable and prudent because LRAB may have taken over as owner of the building. That particular scenario played out here. The parties agreed to the Lease terms knowing that the Quonset hut may eventually transfer to LRAB at the end of the lease period. The Lease provided LRAB protection against Mr. Scherer essentially trashing the building and then handing ownership of it over to LRAB by failing to remove it within the 60–day time period provided. Mr. Scherer, however, breached his covenant to maintain the building and now seeks to impose the cost of that breach on LRAB. The parties' Lease simply does not allow Mr. Scherer's gambit to succeed.

### C. Damages

The Court finds that LRAB is entitled to damages.

The measure of damages for breach of contract is that which would place plaintiff in the same position as he would have been had the contract been performed, less proper deductions. In other words, it is that which will compensate him for the loss which full performance would have prevented or breach of it entailed.

*Reynolds,* 595 P.2d at 1323. "In Wyoming, damages must be proven with a reasonable degree of certainty, but proof of exact damages is not required." *WSP, Inc. v. Wyoming Steel Fabricators & Erectors,* 2007 WY 80, ¶ 18, 158 P.3d 651, 655 (Wyo. 2007).

Had Mr. Scherer not breached the lease provision requiring him to keep the premises clean and in orderly condition, LRAB would have taken ownership over the Quonset hut once Mr. Scherer's 60–day time period for him to remove the building expired. At that point, LRAB would have been free to use the building itself or lease it to a new tenant. However, due to Mr. Scherer's breach, the evidence and testimony presented at trial established that LRAB had no real option but to demolish the Quonset hut.

Mr. Scherer testified that several years into the leasehold, the airport cut off electricity to the building and re-routed it to the fuel farm. Mr. Scherer then testified that the electric company later refused to re-establish electricity to the building unless it was re-wired to conform to current building codes. Thus, in addition to the general disrepair of the building and the bird feces, the Quonset hut did not have power and could not gain it without serious renovation. In sum, the Court finds that the building's demolition was reasonably necessary under the circumstances in light of its dilapidated and dangerous condition. The Quonset hut could not be simply cleaned up for the airport's use or rental.

The Court also notes that the detailed "work plan" provided by Dr. James Dennison contemplates cleanup of the pigeon feces as part of the building's demolition, not with an eye toward future rental of the building. Dr. James Dennison's and Mr. Skinner's primary objective was to prevent any possible contaminants in the excrement from becoming airborne and traveling toward the airport's parking lot and terminal during the building's demolition. The parking lot is immediately adjacent to the Quonset hut. Both the parking lot and the terminal are east of the Quonset hut, significant because Laramie's prevailing wind blows to the east and northeast. Additional cleanup and disinfection beyond that set forth by Dr. James Dennison would likely have been required before the airport could use the building or lease it to a new tenant. In sum, the Court finds that cleanup and demolition of the building was required to return the premises to its pre-lease condition and salvage some utility from the site.

Additionally, Mr. Scherer asserted the affirmative defense that LRAB failed to mitigate its damages in answering the *Complaint. Answer,* at 2 (filed Aug. 25,

2008). Mr. Scherer did not present any cogent argument or evidence supporting this contention at trial. The uncontested evidence was that LRAB received two bids for the cleanup and demolition of the Quonset hut and awarded the contract to the lowest bidder. In fact, LRAB contracted with Summit Trucking to have the job done for $80,300.00 while the other bid was for $142,960.00. Thus, the Court finds that LRAB has proven its damages with the required reasonable degree of certainty and Mr. Scherer has not proven that LRAB failed to mitigate its damages in any way.

LRAB is awarded the damages it incurred in removing the Quonset hut from its property. Those costs include the amount paid to Summit Trucking for the cleanup and demolition of the Quonset hut plus the amount paid to Coffey Engineering for planning the project. LRAB paid Summit Trucking $80,300.00 to clean and demolish the building pursuant to their contract. Plaintiff's Exhibit 5, "Form of Agreement Between Owner and Contractor," at 3. John Galbreath, Coffey Engineering, testified that LRAB paid Coffey Engineering a total of $7,812.97 for planning the project and soliciting contractor bids through newspapers in the surrounding area. Thus, the Court awards damages to LRAB in the amount of **$88,112.97.**

Scherer timely filed his notice of appeal.

## STANDARD OF REVIEW

 [¶ 10] Scherer contends that the district court's judgment is based on two erroneous conclusions of law in its interpretation of the lease and one erroneous finding of fact, as we will discuss below. We review the district court's conclusions of law *de novo. Shepard v. Beck,* 2007 WY 53, ¶ 9, 154 P.3d 982, 986 (Wyo.2007). To the extent we must review the district court's findings of fact in a bench trial, our standard is as follows:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence. Findings of fact will not be set aside unless the findings are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Forshee v. Delaney,* 2005 WY 103, ¶ 6, 118 P.3d 445, 448 (Wyo.2005) (quoting *Springer v. Blue Cross & Blue Shield,* 944 P.2d 1173, 1175–76 (Wyo.1997)).

*Shepard,* ¶ 9, 154 P.3d at 986. Because the record contains neither a transcript of evidence nor a statement of the evidence or proceedings, we are, of course, restricted in our review to those allegations of error not requiring an inspection of the transcript. *Arnold v. Day,* 2007 WY 86, ¶¶ 9, 10, 158 P.3d 694, 697 (Wyo.2007).

## DISCUSSION

 [¶ 11] Our resolution of Scherer's argument that the district court's judgment rests on two erroneous conclusions of law and an erroneous finding of fact requires that we interpret the parties' lease. We have said:

Contract law governs the construction and interpretation of a lease. *Pavuk v. Rogers,* 2001 WY 75, 30 P.3d 19 (Wyo. 2001). A lease is to be construed as a whole, with the objective to find reasonable construction which, if possible, does not render any provision meaningless. *Brazelton v. Jackson Drug Co., Inc.,* 796 P.2d 808, 810 (Wyo.1990). We resolve any doubts as to the meaning of a lease against the drafting party, .... *Id.* If the lease terms are ambiguous, we may consider extrinsic evidence to determine the intent of the parties. *Wadi Petroleum, Inc. v. Ultra Resources, Inc.,* 2003 WY 41, 65 P.3d 703 (Wyo.2003).

\* \* \* \*

We interpret express covenants according to the obvious intention of the parties, in consonance with the reasonable sense of the words employed, and we will not ex-

tend express covenants by interpretation unless their implication is clear and undoubted. *Fuchs v. Goe,* 62 Wyo. 134, 163 P.2d 783, 793 (1945). Additionally, in determining the parties' intention as gleaned from the language, we look to the lease as a whole, keeping in mind the situation of the parties when the lease was made, its subject matter, and purpose of its execution. *Bornel, Inc. v. City Products Corp.,* 432 P.2d 489, 492 (Wyo.1967).

*Brown v. Johnston,* 2004 WY 17, ¶¶ 23, 25, 85 P.3d 422, 429–30 (Wyo.2004). We follow the well-known rule that general provisions in a contract yield to specific provisions, unless the general and specific provisions are reconcilable. *Landen v. Production Credit Ass'n of Midlands,* 737 P.2d 1325, 1328 (Wyo.1987). We also strive to avoid construing a contract so as to render one of its provisions meaningless, because each provision is presumed to have a purpose. *Wyoming Game & Fish Comm'n v. Mills Co.,* 701 P.2d 819, 822 (Wyo. 1985). We should, if possible, avoid a construction leading to a conclusion that inconsistent provisions exist in the contract. *Shepard v. Top Hat Land & Cattle Co.,* 560 P.2d 730, 732 (Wyo.1977).

[¶ 12] Scherer identifies the district court's first erroneous conclusion of law to be the interpretation of an alleged general lease provision—paragraph 19 requiring Scherer during the lease term to "keep the leased premises and adjacent area clean, orderly, and free of accumulated trash at his own expense"—to create a remedy "explicitly available under" an alleged specific lease provision—paragraph 10 containing a 120–day deadline after expiration of the lease for removal of the hut at Scherer's expense. He contends that the district court's interpretation creates a conflict between paragraph 19, an alleged general provision, and paragraph 10, an alleged specific provision. To resolve that alleged conflict, he would apply the rule of construction that a general provision in a lease yields to a specific provision in a lease, unless those provisions are reconcilable. He asserts these particular provisions are irreconcilable and, therefore, paragraph 10, the alleged specific provision, controls. Under that provision, Scherer notes, he bears the expense of the hut's removal under only two scenarios: 1) If he removed the hut within sixty days after the lease expired (paragraph 10(a)); or 2) if the Board removed the hut within sixty days after he failed to remove the hut (paragraph 10(b)). Because neither he nor the Board removed the hut within those specific timeframes, he argues, he must not bear the expense of the hut's removal which occurred nearly two years later.

[¶ 13] Scherer identifies the district court's second erroneous legal conclusion to be that cleanup and demolition of the hut was required to return the leased premises to its pre-lease condition, contrary to paragraph 10(a) of the lease which required him to leave the premises "clean, orderly and as close to the original condition as reasonably possible" only if he removed improvements within sixty days after the lease expired. Somewhat related to this contention, Scherer maintains the district court's judgment is based on a factual error that restoration of the leased premises to its pre-lease condition required demolition of the hut; in this regard, he notes that it is undisputed that the hut was present on the leased premises before the lease was executed. He argues that logically the hut's demolition would not restore the leased premises to its pre-lease condition.

[¶ 14] In response to Scherer's argument, the Board asserts that paragraphs 10 and 19 of the lease are not in conflict because they "encompass completely different contractual premises." The Board argues that paragraph 10 enumerates the parties' rights *following expiration* of the lease term contemplating that lessee Scherer during the lease term performed his duty under paragraph 19 to "keep the leased premises and adjacent area clean, orderly, and free of accumulated trash at his own expense." On the other hand, the Board states, paragraph 19 pertains specifically to lessee Scherer's duty *during* the lease term. Had Scherer performed his paragraph 19 duty during the lease term as contemplated, on lease expiration the parties had the option to remove or not a hut in undamaged condition. This important point is clearly recognized by the district court in this excerpt from its decision letter:

Though Mr. Scherer owned the Quonset hut during the lease term, and he could theoretically do with it as he pleased (including allowing it to fall into disrepair), the Lease contemplated potential transfer of the building to LRAB following expiration of the Lease. Therefore, the provision requiring Mr. Scherer to keep the building clean, orderly, and free of accumulated trash was reasonable and prudent because LRAB may have taken over as owner of the building. That particular scenario played out here. The parties agreed to the Lease terms knowing that the Quonset hut may eventually transfer to LRAB at the end of the lease period. The Lease provided LRAB protection against Mr. Scherer essentially trashing the building and then handing ownership of it over to LRAB by failing to remove it within the 60–day time period provided. Mr. Scherer, however, breached his covenant to maintain the building and now seeks to impose the cost of that breach on LRAB. The parties' Lease simply does not allow Mr. Scherer's gambit to succeed.

[¶ 15] In connection with Scherer's duty under paragraph 19 of the lease, the Board correctly observes that Scherer has not challenged the sufficiency of the evidence of the district court's factual findings that the Board was forced to demolish the hut because of its dilapidated and dangerous condition and that the costs of $88,112.97 incurred to clean the leased premises were reasonable.

[¶ 16] Responding to Scherer's claim that the district court erroneously concluded that the cleanup and hut demolition was required to return the leased premises to its pre-lease condition, contrary to paragraph 10(a) which required him to leave the premises as close as reasonably possible to its pre-lease condition only if he removed the improvements, the Board states that the district court simply concluded that Scherer was responsible for the damages incurred as a result of his breach of his duty under paragraph 19.

[¶ 17] We have carefully considered the parties' arguments and the district court's decision, and conclude that Scherer's position has no merit. As we construe the lease, paragraphs 10 and 19 are unambiguous and

are clearly not in conflict. Paragraph 10 concerns the removal of a hut in reasonably good condition within 120 days after expiration of the lease. Paragraph 19 concerns lessee Scherer's duty during the lease term to keep the leased premises clean, orderly, and free of accumulated trash at his own expense. Without question, as the district court correctly found and concluded, Scherer breached that paragraph during the lease term and must bear the expense of cleaning the leased premises which includes the demolition and removal of the accumulated trash in the form of the dilapidated and dangerous hut.

[¶ 18] Our construction of the lease between the Board and Scherer achieves, as did the district court's construction, the objective of finding a reasonable construction which does not render meaningless any provision of the lease. The lease terms are unambiguous, and paragraphs 10 and 19 are easily reconcilable as each provision serves a distinct purpose. Clearly, they are not in conflict. Our construction has considered the lease as a whole, keeping in mind, as did the district court, the parties' situation when the lease was executed, its subject matter, and the purposes of its execution.

[¶ 19] We affirm the judgment of the district court in all respects.