# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 142

OCTOBER TERM, A.D. 2015

*November 12, 2015*

DAVID A. POPE, CPA LLC and
DAVID A. POPE, individually,

Appellants
(Petitioners),

v.                                                      S-14-0291

MARY C. ROSENBERG,

Appellee
(Respondent).

---

*Appeal from the District Court of Fremont County*
*The Honorable Marvin L. Tyler, Judge*

*Representing Appellants:*
    Jeffrey S. Pope, Attorney at Law, Cheyenne Wyoming.

*Representing Appellee:*
    Joel M. Vincent of Vincent & Vincent, Riverton, Wyoming.

*Before BURKE, C.J., and HILL, KITE*, DAVIS, and FOX, JJ.*

*DAVIS, J., delivers the opinion of the Court; FOX, J., files a dissenting opinion, in which KITE, J. (Ret.), joins.*

*\* Justice Kite retired from judicial office effective August 3, 2015, and pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2015), she was reassigned to act on this matter on August 4, 2015.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS, Justice.**

[¶1]    Mary C. Rosenberg executed a non-compete agreement restricting her ability to compete with the accounting firm she sold to David A. Pope, CPA PC.  Before the expiration of the non-compete agreement, Ms. Rosenberg secured employment with a former client as an office manager.  Mr. Pope alleged that this was a violation of the non-compete agreement and stopped payments on a promissory note which was part of the parties' purchase agreement.  Ms. Rosenberg brought suit alleging breach of contract and requesting that the district court declare that she had not violated the non-compete agreement.  On cross-motions for summary judgment, the district court determined that Ms. Rosenberg had not violated the non-compete agreement and further found that Mr. Pope breached the terms of the promissory note and guarantee by stopping payment.  We affirm.

## ISSUE

[¶2]    The sole issue on appeal is whether the district court erred when it found Ms. Rosenberg had not violated the non-compete agreement.[1]

## FACTS

[¶3]    The facts of this case are generally undisputed, although they are perhaps not entirely clear in certain respects.  James D. Soumas and Ms. Rosenberg were partners in the accounting firm of Soumas and Rosenberg, P.C. (S&R), which operated in Riverton, Wyoming for many years.  On April 22, 2004, Mr. Soumas and Ms. Rosenberg signed an Offer for Purchase and Sale of Assets, Earnest Money Receipt and Purchase Agreement (Purchase Agreement), which governed the sale of the business to David A. Pope, CPA PC.[2]  The total purchase price was $350,000, with all but $70,000 to be paid by closing.  On June 30, 2004, Mr. Pope signed a $19,000 promissory note naming Rosenberg as Lender (as assigned by S&R)[3] and David A. Pope, CPA, LLC as the Borrower (as assigned from David A. Pope, CPA PC).[4]  Mr. Pope personally guaranteed the "performance and timely payment of the above promissory note."  The district court

---

[1] Ms. Rosenberg also alleges in her brief that the duration of the covenant not to compete was unreasonable.  However, she failed to present this issue to the district court, and we will not address it for the first time on appeal.  Moreover, we need not reach this question in light of our decision.

[2] Mr. Soumas signed "as President, Shareholder and Personally," and Ms. Rosenberg signed "as Secretary/Treasurer, Shareholder and Personally."

[3] The purchase price was reduced based on recalculation of the value of accounts receivable, and Pope provided Soumas and Rosenberg with a $19,000 note each, for a total of $38,000 for this component of the purchase price.

[4] Throughout this opinion, we will refer to the appellants, David A. Pope, CPA LLC and David A. Pope, collectively as Pope, and to Mr. Pope when we refer to him as an individual.

1

determined that the Purchase Agreement and promissory note formed a single contract with each incorporating the other.[5]

[¶4] The Purchase Agreement allocated the $350,000 to specific components of the assets purchased, assigning $160,000 to good will and $15,000 to a non-compete agreement precluding Mr. Soumas and Ms. Rosenberg from competing with the business for a number of years following the sale.[6] The non-compete agreement states:

> 12. <u>Covenant Not to Compete and Limited Covenant Not to Compete</u>: For a period of five (5) consecutive years from the closing date, the seller (including its present Partners, Principals, Members, or Shareholders) agrees to not directly nor indirectly:
>
> A. Compete with the buyer or engage in the practice of public accounting within 100 miles of the present location of the practice purchased;
>
> B. Aid or assist anyone else, except buyer, to do so within these limits;
>
> C. Solicit in any manner or provide any public accounting services for any past or present clients or solicit or hire any employees of the practice;
>
> D. Have any interest in a public accounting practice within these limits;
>
> E. Request or advise any present or future clients to withdraw or cancel its business with the buyer.
>
> For a period of five (5) consecutive years from the end of the Covenant Not to Compete, there shall be in effect a Limited Covenant Not to Compete. During this period, Seller (including its present Partners, Principals, Members, or Shareholders) shall pay to buyer within 30 days of receipt, 25% of his or her gross receipts from the practice of public accounting within the limits outlined above, but only those

---

[5] The district court's determination that the Purchase Agreement and promissory note formed a single contract was not challenged on appeal.

[6] The final purchase price was to be adjusted after one year based upon the amount billed in the year following the purchase.

receipts derived from providing public accounting services to clients that Buyer has provided services during the term of the first Covenant Not to Compete. Payments by Seller to Buyer under this provision will cease 30 days after the tenth anniversary of the date of closing for all amounts due through the tenth anniversary of the date of closing.

**Nothing contained herein is intended to prohibit the seller from employment as a controller, bookkeeper, CFO, Treasurer, or similar function with a private company or government entity, so long as it is not a client of the practice.**

. . . Each partner, Principal, Member or Shareholder, by signing this agreement, accepts and agrees to be bound by this covenant not to compete and this limited covenant not to compete.

(Emphasis added). The agreement thus prohibited certain forms of competition for a total of ten years.

[¶5] Rosenberg worked for Pope after the sale until November 2005, when she left and took a job with Wyoming Senior Citizens, Inc. In that position, she was not required to perform any accounting services, and she therefore placed her CPA permit on inactive status, and then upon reaching the age of 55, she placed her permit on retired status, which she was entitled to do if not engaged in activities that required a CPA license. Rosenberg continued to work for Wyoming Senior Citizen's, Inc. until the summer of 2008, when she applied for and was awarded the position of office manager for the Fremont County Fire Protection District (District).

[¶6] The District was one of S&R's most lucrative clients at the time of the sale. It continued to retain Pope's services for three years afterward, but terminated the relationship in June 2007. The record tells us little about the reason that the District chose another accountant. However, there is nothing in the record which would suggest that either Rosenberg or Soumas had anything to do with that decision.[7] Rosenberg described her limited contact before the District changed accounting firms. She attested by affidavit that on one occasion in 2006, its office manager contacted her to ask questions about how she had prepared the District's budget when she was with the accounting firm. She answered the questions, but also suggested that they meet with the

---

[7] If they had, this would have violated another provision of the agreement, which prohibited them from requesting or advising any present or future clients of the firm to withdraw or cancel their business with Pope.

3

Pope employee who had replaced her. At the meeting, she explained how she had approached the budget in the past. She did not charge either the District or Pope for her time. She had no other contact with the District after leaving Pope until she applied for the office manager position.

[¶7] The District retained another accounting firm to provide the services previously rendered by S&R and then Pope. Still another accounting firm audited the District's financial records before and after the sale and the District's change of accountants.

[¶8] About a year after the District changed accounting firms, it advertised for a new office manager. Rosenberg applied and was hired. She was asked to perform certain accounting services for the District's manager in her role as office manager, including preparing the annual budget and preparing for the annual audit.

[¶9] Rosenberg attested by affidavit that she consulted with the Director of the Wyoming Board of Certified Accountants, who advised her that she could not keep her license on inactive status if she performed any functions that might fall within the broad definition of the practice of accounting.[8] She either had to return it to active status, or surrender it.

[¶10] Rosenberg was inclined to surrender her license, as she was not required to be a CPA to be the District's office manager. However, the District and the accounting firm which had replaced Pope felt that a CPA license would add credibility to the various state and federal reports she had to prepare, and the District agreed to pay the fee for the license and Rosenberg's continuing CPA education. Rosenberg therefore reactivated her license.

[¶11] Mr. Pope learned of Ms. Rosenberg's employment by the District and informed her that he believed this to be a violation of the non-compete agreement. They exchanged letters stating their respective positions, but were unable to come to a compromise. The default and remedies provision in the Purchase Agreement provides that: "In the case of Seller breach, Buyer may immediately cease performance and avail itself of any and all remedies available hereunder or at law or equity for such breach or default, including Buyer's right to damages and specific performance." Mr. Pope stopped making payments on the promissory note based on that provision, claiming that Rosenberg breached the Purchase Agreement by taking a job requiring the performance of some accounting duties for a former client. Rosenberg responded by filing suit.

---

[8] *See* Wyo. Dep't of Admin. & Info., Bd. of Certified Public Accountants Rules and Regulations ch. 1, § 2(dd), ch. 3, § 1(b) (filed Sept. 26, 2012), listing a wide range of functions qualifying as public accounting.

[¶12] In her complaint, Rosenberg alleged that Pope breached the promissory note and the personal guarantee. She also requested that the district court enter a declaratory judgment confirming her understanding of the terms of the promissory note, and declaring that her employment with the District did not violate the non-compete agreement. Pope counterclaimed, asserting that Ms. Rosenberg had breached the contract and the implied covenant of good faith and fair dealing. He also requested a declaratory judgment of the terms of the contract and promissory note and a judgment determining that Rosenberg had violated the non-compete agreement. Pope also asked the district court to rescind the contract.

[¶13] The parties filed cross motions for summary judgment. After a hearing, the district court determined that Rosenberg had not violated the non-compete agreement because she fell within the limited exception quoted above. It therefore rendered a declaratory judgment in her favor and also determined that Pope had breached the terms of the note. It found that there were genuine issues of material fact for trial as to the amount due on the note.

[¶14] The parties subsequently stipulated that Pope owed $13,908.80 on the note, and that Rosenberg was entitled to judgment in that amount.[9] After additional briefing and argument, the court also awarded Rosenberg $5,895.79 in attorney fees and expenses, as permitted by the note. Pope timely appealed.

## STANDARD OF REVIEW

[¶15]     We evaluate the propriety of a summary judgment by employing the same standards and using the same materials as the district court. *Cook v. Shoshone First Bank*, 2006 WY 13, ¶ 11, 126 P.3d 886, 889 (Wyo. 2006). Thus, our review is plenary. *Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 7, 75 P.3d 640, 647 (Wyo. 2003).

> Wyo. R. Civ. P. 56 governs summary judgments. A summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c). When reviewing a summary judgment, we consider the record in the perspective most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly drawn from the record. We review questions of

---

[9] We have been unable to find a judgment for that amount in the record, although the district court did approve the stipulation.

5

> law de novo without giving any deference to the district court's determinations.
>
> > *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 11, 123 P.3d 579, 586 (Wyo. 2005), quoting *Baker v. Ayres and Baker Pole and Post, Inc.*, 2005 WY 97, ¶ 14, 117 P.3d 1234, 1239 (Wyo. 2005).

*Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶ 8, 148 P.3d 8, 12 (Wyo. 2006).

## DISCUSSION

### *Did the district court err when it found that Ms. Rosenberg had not violated the non-compete agreement?*

[¶16] Before analyzing the facts in this case as they relate to the law, we must first address potential confusion as to the proper legal standard. Covenants not to compete are often found in two contexts, employment agreements and agreements for the sale of a business. The former are strictly construed because they are likely to be the result of unequal bargaining strength and may deprive the covenantor of his or her ability to earn a living, to the possible detriment of the public. *Holland v. Holland*, 2001 WY 113, ¶ 12, 35 P.3d 409, 413 (Wyo. 2001) (citing *Ridley v. Krout*, 63 Wyo. 252, 180 P.2d 124, 127 (1947)); 15 Grace M. Giesel, *Corbin on Contracts* § 80.6, at 67, § 80.8, at 83 (Revised ed. 2003).

[¶17] Covenants not to compete ancillary to the sale of a business are not viewed in the same light. The bargaining positions of the parties are likely to be more equal, and the buyer is entitled to protect his investment in the good will of the business, which would be lost if the seller could freely compete. 15 Giesel, *id.*; 6 Richard A. Lord, *Williston on Contracts* § 13.4, at 196 (4th ed. 2009); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 5.3, at 29 (3d ed. 2004). In addition, the harm to the public is not as great, as the purchaser will presumably continue to provide the service the seller did.

[¶18] However, a covenant not to compete ancillary to the sale of a business must still be reasonable. *Preston v. Marathon Oil Co.,* 2012 WY 66, ¶ 15, 277 P.3d 81, 86 (Wyo. 2012); *Holland,* ¶¶ 10, 13, 35 P.3d at 413-14.; 6 Lord*, supra*, § 13.4, at 196. To be reasonable, a covenant ancillary to the sale of a business must protect some legitimate interest of the promisee, its scope must be reasonable, and it must not cause unreasonable hardship to the promisor or the public. 2 Farnsworth, *supra*, § 5.3, at 28. It must be reasonable in scope in light of its protection of the promisee's legitimate interests. *Id*. at 29. *See also* 6 Lord, *supra*, § 13.5, at 216-30 (restraint must be reasonable in light of protecting buyer's interest, including the good will purchased); 15 Giesel, *supra*, § 80.9, at 84 (buyer may restrict the seller's freedom of trade only so far as is necessary to

6

protect the buyer in the enjoyment of the good will for which the buyer has paid). We have held that the seller bears the burden of proving that a restriction ancillary to the sale of a business is unreasonable. *Oliver v. Quynn*, 2013 WY 70, ¶¶ 8-10, 303 P.3d 1119, 1123-24 (Wyo. 2013) (citing *Holland, id.*).

[¶19] We mention this basic conceptual framework because the district court and the parties both referred to the process by which the reasonableness of a covenant not to compete is weighed. The operative facts are undisputed – the District was a client of Rosenberg and Soumas at the time the sale of the accounting firm was negotiated and consummated. It was not a client when the District hired Rosenberg as an office manager. The question is whether the agreement prohibited Rosenberg from accepting in-house employment as an office manager with a former client which had left the firm, or whether it only prohibited her from working for an employer who was a client of the firm at the time of accepting the employment. That decision was brought to a head by cross-motions for summary judgment – each party contended for a particular interpretation of the key language of the agreement. Although cross-motions for summary judgment must be evaluated separately, the parties agree that there are no genuine issues of material fact, and that the resolution of this dispute turns on interpretation of two phrases in the agreement. 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2720 (3d ed., database updated April 2015) (cross-motions for summary judgment must considered separately).

[¶20] Our rules of contract interpretation are well-established.

> The fundamental goal of contract interpretation is to determine the intent of the parties. *Whitney Holding Corp. v. Terry*, 2012 WY 21, ¶ 36, 270 P.3d 662, 673 (Wyo. 2012). The "language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use." *Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo. 2010) (quoting *Moncrief v. Louisiana Land Exploration Co.*, 861 P.2d 516, 524 (Wyo. 1993)). This Court employs "common sense in interpreting contracts and ascribe[s] the words with a rational and reasonable intent." *Id.*, ¶ 22, 226 P.3d at 905. "When the provisions in the contract are clear and unambiguous, the court looks only to the 'four corners' of the document in arriving at the intent of the parties." *Claman v. Popp*, 2012 WY 92, ¶ 26, 279 P.3d 1003, 1013 (Wyo. 2012) (citations omitted). "In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate." *Id.* (citation omitted).

7

We have said that we will construe contract language "in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made." *Stone v. Devon Energy Prod. Co., L.P.*, 2008 WY 49, ¶ 18, 181 P.3d 936, 942 (Wyo. 2008). However, we will not "rewrite contracts under the guise of interpretation, and so long as there is no ambiguity, we are bound to apply contracts as they have been scrivened." *Amoco Prod. Co. v. EM Nominee P'ship Co.*, 2 P.3d 534, 540 (Wyo. 2000).

*Comet Energy Services, LLC v. Powder River Oil & Gas Ventures, LLC*, 2008 WY 69, ¶ 11, 185 P.3d 1259, 1263 (Wyo. 2008).

Our rules of interpretation require that we interpret a contract as a whole, reading each provision in light of all the others to find their plain meaning. *Arnold v. Ommen*, 2009 WY 24, ¶ 40, 201 P.3d 1127, 1138 (Wyo. 2009); *see also Caballo Coal Co. v. Fid. Exploration & Prod. Co.*, 2004 WY 6, ¶ 11, 84 P.3d 311, 314-15 (Wyo. 2004). We presume each provision in a contract has a purpose, and we avoid interpreting a contract so as to find inconsistent provisions or so as to render any provision meaningless. *Scherer v. Laramie Reg'l Airport Bd.*, 2010 WY 105, ¶ 11, 236 P.3d 996, 1003 (Wyo. 2010).

*Claman,* 2012 WY 92, ¶ 28, 279 P.3d at 1013.

*Wallop Canyon Ranch, LLC v. Goodwyn*, 2015 WY 81, ¶ 35, 351 P.3d 943, 952-53 (Wyo. 2015).

[¶21] The interpretation of contracts presents questions of law, which we review de novo. *Hofhine v. Hofhine*, 2014 WY 86, ¶ 8, 330 P.3d 242, 245 (Wyo. 2014) (citing *Knight v. TCB Constr. & Design, LLC*, 2011 WY 27, ¶ 7, 248 P.3d 178, 181 (Wyo. 2011)).[10]

---

[10] *Williston on Contracts* distinguishes between construction of contracts and their interpretation. That text defines interpretation as review of a promise, agreement, or a term with the goal of "ascertainment of

[¶22] We first review the agreement to see if, when read in its entirety, it is clear and unambiguous. Pope first argues that work Rosenberg actually does for the District is not "substantially similar" to that of a controller, bookkeeper, CFO, or treasurer. He contends that it is not substantially similar because it involves the performance of some duties which require her to utilize her CPA license. The record supports the contention that Rosenberg does perform some duties which would involve accounting work previously performed by Pope or Soumas and Rosenberg, such as assisting with preparation of the budget, reviewing financial statements, etc.

[¶23] The District has in fact asked Rosenberg to perform duties not originally envisioned for the position, probably because she has accounting skills. Pope argues, in essence, that a position which involves the use of Rosenberg's CPA license is not similar to the positions listed. We disagree.

[¶24] The language of the agreement would be meaningless if it only allowed Rosenberg to take positions which did not involve accounting skills. The language quoted above is an exception to the covenant not to compete. There could be no conceivable violation of the covenant not to compete unless Rosenberg performed some functions which Pope did or might perform, and the language would thus be meaningless if interpreted as he suggests. We do not construe contracts in a fashion that renders any provision of them meaningless. *Shaffer v. WINhealth Partners*, 2011 WY 131, ¶ 17, 261 P.3d 708, 713 (Wyo. 2011) (citing *Scherer v. Laramie Reg'l Airport Bd.,* 2010 WY 105, ¶ 11, 236 P.3d 996, 1003 (Wyo. 2010)). We conclude that the position of office manager is similar to that of a controller, bookkeeper, CFO, or treasurer because all necessarily involve some accounting skills, for which Rosenberg would have had to reactivate or surrender her CPA license given the broad definition of practice of accounting in the regulations.

[¶25] The next question is whether the phrase "client of the practice" in the clause means that it prohibits Rosenberg from accepting employment for an entity which has ever been a client of Soumas and Rosenberg or Pope, or only from accepting employment with an entity which is a client of the firm at the time she accepts the position. Pope argues that the phrase "client(s) of the practice" is used elsewhere in the agreement, and that the term must mean the same thing each time it is used. For example, in one section, "clients of the practice" is included in the definition of what Soumas and Rosenberg sold to Pope. In another, Soumas and Rosenberg agreed to make every effort to retain and properly service the "clients of the practice" pending completion of the sale. In still another, the final purchase price was to be adjusted based

---

its meaning by determining the meaning of the words employed." The text defines "construction" to involve a court determining the legal effect of the words used in a contract. 11 Lord, *supra*, § 30:1. That distinction may be a bit too fine for practical application in a case such as this. Suffice it to say that we will begin our review by trying to determine what the parties agreed upon based on the words they used.

upon amounts billed to "clients of the practice," including new clients and entities for whom the firm performed services between the date of the agreement and the date of adjusting the price. We agree that the phrase "clients of the practice," as used in those clauses, refers to the clients at the time of the events identified.

[¶26] However, that is where we part company with Appellant. We repeat the language contained in the agreement:

> **Nothing contained herein is intended to prohibit the seller from employment** as a controller, bookkeeper, CFO, Treasurer, or similar function with a private company or government entity, so long as it **is** not a client of the practice.

(Emphasis added).

[¶27] Appellant focuses on the use of the phrase "client of the practice," a noun modified by a phrase beginning with a preposition, to the exclusion of the verb preceding it and other language of the key sentence. The sentence we should analyze begins with "[n]othing contained herein is intended to prohibit the seller from employment . . . ." This introductory phrase sets the stage and creates a temporal relationship with the rest of the sentence. It applies to the potential event of the seller taking employment in specified positions with a client of the practice.

[¶28] The import of the rest of the sentence turns on what the meaning of "is" is. *C.f. Sun Towers, Inc. v. Heckler*, 725 F.2d 315, 320 (5th Cir. 1984) ("is notified" refers to the receipt of notice). "Is" is the present tense of the verb "be." "To be" means "to live; to exist; to have a specified state or quality." *Webster's New Dictionary and Thesauraurus* 56 (1989); *see also Webster's Third New International Dictionary* 1197 (Merriam Webster 2002) ("is" means "that which is; specif: that which is factual, empirical, actually the case, or spatiotemporal – contrasted with *ought*"). The sentence in question says and means that one cannot accept employment as an office manager who must perform incidental functions for which a former CPA must have a license with an entity which **is**, at that time, a "client of the practice."

[¶29] If one went back in time and stood in Rosenberg's shoes on the date that she decided to apply for employment with the Fire District, one would quite naturally conclude that she was not prohibited from employment because the District "is" not a "client of the practice." Put another way, the District did not have the specified quality (being a client of the practice) on that date. No further adjective (for example, "current") is required.

[¶30] This straightforward reading of the language in this key provision is consistent with the nature of the clause – it does not allow Appellee to open a CPA office and

10

provide services to former clients – it only allows her to hold certain in-house positions with a company that is not at the time a client of the practice. The clause would not be necessary if it did not contemplate the performance of functions which might fall within a CPA's licensure. As we have already noted, the use of the words "controller, bookkeeper, CFO, Treasurer" virtually assure that some functions requiring Rosenberg to reactivate her CPA license would be involved if she took that kind of employment.

[¶31] We need go no further than to read the key language in context, which does not require construction. Of course, the parties could have adopted a global definition of the phrase "client of the practice" which might have created a universal meaning. In the preceding paragraph, the agreement provides that in the second five years after the sale, during the term of the limited covenant not to compete, Ms. Rosenberg would have to pay Pope 25% of anything she earned providing CPA services, but only as to "those receipts derived from providing public accounting services to clients that Buyer has provided services during the term of the first Covenant Not to Compete" (the first five years).

[¶32] It would have been equally simple to expand the applicable clause by the addition of other language – "so long as it is not or has not at any time been a client of the practice." The parties would have been free to agree to such a definition. *See, e.g.,* 5 Kniffin, *supra*, § 24.8 (parties to a contract may even go so far as to deprive ordinary English words of their common meaning and supply a different meaning – black may be defined to mean white, 500 feet to mean 100 inches, etc.). In fact, the drafter of the agreement did exactly this in the non-solicitation clause, which applies to "past or present clients." Appellant asks us to equate "is" with "is or has been," which would achieve the same result as the clause just referred to. But to do so would require this Court to read terms into the agreement, thereby violating a basic tenet of contract interpretation. *Berthel Land and Livestock v. Rockies Exp. Pipeline LLC*, 2012 WY 52, ¶ 12, 275 P.3d 423, 430 (Wyo. 2012) (quoting *Davison v. Wyo. Game & Fish Comm'n*, 2010 WY 121, ¶ 9, 238 P.3d 556, 560 (Wyo. 2010), which in turn cites *Lozier v. Blattland Investments, LLC*, 2004 WY 132, ¶ 9, 100 P.3d 380, 383-84 (Wyo. 2004)).

[¶33] The timing of the relationship as a "client of the practice" must be determined by context absent such an express provision, and when read in context, the agreement as to that timing is clear. Although it is not necessary to construe the pertinent language of this contract, the plain language reading we give the clause in question comports with rules of construction. Courts should attempt to construe contracts so as to avoid unreasonable or unlawful terms. 5 Kniffin, *supra*, § 24.22; 11 Lord, *supra*, § 32:11; Restatement (Second) of Contracts § 203 (1981). We have already noted that a covenant not to compete will be enforced if it protects some legitimate interest of the promisee, its scope is reasonable, and it does not cause unreasonable hardship to the promisor or the public. *See* authorities cited above, ¶ 18. It is difficult to imagine what legitimate interest Pope has in preventing Rosenberg from taking in-house employment with a client which no

11

longer uses his services, and it is equally difficult to see how the hardship on Rosenberg can be reasonable under the circumstances.[11]

[¶34] Other factors also render this reading of the plain language of the agreement reasonable:

- Based on the language we have just referred to, Rosenberg could open up a CPA office, and if a client used Pope's services in the sixth year of the agreement, but chose to employ her instead after that, she could provide him accounting services without liability. On the other hand, Rosenberg could not accept full-time employment in one of the listed occupations for such a client, even though the impact on Pope's business would almost certainly be less. She would thus have more contractual freedom to accept some of Pope's clients if she practiced as a certified public accountant than she does as an office manager for the District.

- Pope has no actual damages,[12] because the District terminated its relationship with his accounting firm and there is nothing in the record to suggest that it would have offered him employment which would involve any of the work Rosenberg now does during the original or extended term of the covenant not to compete if she did not hold her current position.[13] The district hired another accounting firm to

---

[11] We recognize that Pope has a legitimate interest in preventing Rosenberg from opening a public accounting office and taking former clients. That conduct is prohibited by the express terms of the agreement.

[12] One can recover nominal damages for a breach of contract when no actual damage flows from it, but this is cold comfort to litigants unless it triggers some right to additional relief. Restatement (Second) of Contracts § 346 (1981).

[13] The agreement contains a liquidated damages provision, as it requires Rosenberg to pay 25% of the gross receipts from the practice of accounting that she receives from clients during the first five years after the sale if she practices in the second five years. We have held that a contract may not impose a penalty on a party, although the contract may provide for liquidated damages. *G.C.I., Inc. v. Haught,* 7 P.3d 906, 910 (Wyo. 2000). In *Ray v. Electrical Products Consolidated,* 390 P.2d 607, 608 (Wyo. 1964), the Court adopted the standards set by Restatement (First) of Contracts § 339 (1932) to determine whether a provision is a penalty or a proper liquidated damages clause. The more recent Restatement (Second) of Contracts § 356 (1981) reorganizes the test in the first restatement, but it is the same:

> Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

The interpretation Pope seeks has no reasonable connection to any anticipated or actual loss, because there could be no loss. Pope could not have expected any payment from a client which decided to use another firm's services. Moreover, it would be relatively easy to prove the losses in this case – if Rosenberg in fact performs functions previously performed by Pope or S&R (even though the

12

perform functions Pope and S&R previously performed. Perhaps his termination by a public entity might have a negative effect on his firm's reputation, but there is no dispute of fact that Rosenberg had nothing to do with that. If she had, she would be liable for damages under another provision of the contract prohibiting her from interfering with the relationships Pope has with the firm's clients.[14]

[¶35] The district court's interpretation of the key clause is thus supported by its plain language and the policies which would drive its construction if it were not clear.

## CONCLUSION

[¶36] The district court correctly concluded that Rosenberg's employment with the District fell within an exception to the covenant not to compete. We therefore affirm the district court's ruling denying Pope's motion for summary judgment and granting Rosenberg's.

---

performance of that work ceased a year before she went to work for the District on Pope's termination), he should be able to demonstrate that from the firm's historical receipts from the District.

[14] Rosenberg and Soumas agreed not to, directly or indirectly, "[r]equest or advise any present or future clients to withdraw or cancel its business with the buyer." This clause applies to future clients without ambiguity, although whether it is legally enforceable for an indefinite period is another question.

**FOX, Justice,** dissenting, in which **KITE, Justice (Ret.),** joins.

[¶37] I respectfully dissent because I believe that when Ms. Rosenberg became employed as Fremont County Fire Protection District's office manager, she was employed "as a controller, bookkeeper, CFO, Treasurer, or similar function with a private company" that was a client of the practice, and thus she violated the non-compete agreement.

[¶38] I would begin by noting that the reasonableness of the non-compete agreement is not at issue here, unlike the typical non-compete case in which the parties ask the courts to determine whether certain restraints are enforceable. *See, e.g., Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 539-40 (Wyo. 1993); *Holland v. Holland*, 2001 WY 113, ¶¶ 12-20, 35 P.3d 409, 413-15 (Wyo. 2001). In this case, the parties have only asked us to determine what the contract says; they have not asked us to decide whether what it says is reasonable (other than to request we decide the duration is unreasonable, which the majority correctly points out is an issue not raised below).

[¶39] The distinction between a non-compete entered into in the context of the sale of a business and a non-compete entered into in the employment context is therefore not particularly significant in this case for purposes of determining which party has the burden of showing the restraints are reasonable or unreasonable. The sale of the business context remains important, however, for purposes of interpreting the contract.

[¶40] "[T]he fundamental goal of contract interpretation is to determine the intent of the parties." *Whitney Holding Corp. v. Terry*, 2012 WY 21, ¶ 36, 270 P.3d 662, 673 (Wyo. 2012). "We have said that we will construe contract language 'in the context in which it was written, looking to the surrounding circumstances, the subject matter, and the purpose of the agreement to ascertain the intent of the parties at the time the agreement was made.'" *Wallop Canyon Ranch, LLC v. Goodwyn*, 2015 WY 81, ¶ 35, 351 P.3d 943, 953 (Wyo. 2015) (citations omitted).

[¶41] The context in which this non-compete was written is a sale of business which expressly includes the business's goodwill. "The goodwill of the business is often a more important aspect of the purchase of a business than the physical assets." *WSP, Inc. v. Wyo. Steel Fabricators & Erectors, Inc.*, 2007 WY 80, ¶ 14, 158 P.3d 651, 654 (Wyo. 2007). Here, the Purchase Agreement valued goodwill at $160,000, nearly half the $350,000 total price. "The sale of 'goodwill' includes the seller's transfer to the buyer of his customers' confidence in him as an honest and knowledgeable businessman, and the seller's implicit recommendation to his customers to trade with the new proprietor." Gary P. Kohn, Comment, *A Fresh Look: Lowering the Mortality Rate of Covenants Not to Compete Ancillary to Employment Contracts and to Sale of Business Contracts in Georgia*, 31 Emory L.J. 635, 639 (1982).

[¶42] A buyer's ability to capitalize on the goodwill that he has purchased is largely dependent on a seller's agreement not to compete. *See WSP, Inc.*, 2007 WY 80, ¶ 14, 158 P.3d at 654 ("An agreement by the seller to refrain from competition with the buyer can be critical to the transfer of goodwill. 'A transfer of goodwill cannot be effectively accomplished without an enforceable agreement by the transferor not to act so unreasonably to diminish the value of that which he is selling.'" (Citations omitted.)). Here, the parties reinforced the transfer of goodwill with a non-compete agreement, to which they allocated $15,000 of the purchase price.

[¶43] Sale of goodwill "necessarily implies an obligation by the seller to deliver the business sold and to refrain from taking back that which he has sold[.]" Kohn, *supra*, 31 Emory L.J. at 639.

> Covenants not to compete ancillary to the sale of a business or profession serve a useful economic function by enhancing the vendibility of a business or profession because the seller, by promising not to compete with the buyer, is able to receive the highest possible price for the property that is sold and the buyer is willing to pay a premium for the business or profession knowing it is protected by not running the risk of losing what was purchased should the seller become a competitor.

*Weaver v. Ritchie*, 478 S.E.2d 363, 368 (W. Va. 1996).

[¶44] The context in which the non-compete agreement was written, the surrounding circumstances, the subject matter, and the purpose of the agreement, all compel the conclusion that the intent of the parties at the time the agreement was made was to prohibit Ms. Rosenberg from taking back what she had sold. What she had sold were the clients of the practice at the time of the sale.

[¶45] Use of the term "client(s) of the practice" throughout the contract likewise supports its meaning as a client at the time of the sale. "A 'cardinal principle' in our review of contracts is that 'a document should be read to give effect to all its provisions and to render them consistent with each other.'" *Herling v. Wyo. Mach. Co.*, 2013 WY 82, ¶ 52, 304 P.3d 951, 964 (Wyo. 2013) (citation omitted). We also construe the contract as a whole, affording meaning to all of the language used. *Shepard v. Top Hat Land & Cattle Co.*, 560 P.2d 730, 732 (Wyo. 1977).

[¶46] The term "clients of the practice" first appears in the Purchase Agreement when describing what the purchase includes:

> **The Practice**: The goodwill of the practice, including the name, rights to provide accounting services to all ***clients of the Practice***, a non-compete agreement from the Seller, the practice name, telephone numbers, email addresses and web-sites, and any and all copyrights, trade-names, logos, and any other intangible assets that may be used in the Practice.

(Second emphasis added.)  This provision indicates that Mr. Pope purchased the right to provide accounting services to all clients that the practice maintained at the time of the sale since the practice could only sell the right to provide services to clients that it possessed at that time.

[¶47]  The term is also used when the parties discuss the final purchase price adjustment.  According to the terms of the Purchase Agreement, the price of the business would be adjusted after one year, depending on the amount billed over the twelve-month period following the sale.  In that context, the contract states: "Billings are to include any unbilled work in process and will encompass any work performed for any ***clients of the practice***, including new clients and new entities not directly originating from the buyer."  (Emphasis added.)  This provision distinguishes between "clients of the practice" on the date of the sale and new clients obtained in the twelve-month period following the sale.  If the term "clients of the practice" encompassed clients at the time of the sale as well as future clients, there would be no need to include the additional language "including new clients and new entities."

[¶48]  "Clients of the practice" is also used when describing the warranties and representations made by Mr. Pope—"Buyer shall make every effort to retain and properly service the ***clients of the Practice***[.]"  (Emphasis added.)  The term "retain" indicates that Mr. Pope was to make every effort to "keep or hold" clients in the business's possession.  *Webster's II New College Dictionary* 968 (3d ed. 2005).  He could only keep or hold clients that the practice had serviced at the time of the sale.  Any other reading of this provision would render it meaningless.

[¶49]  Our rules of contract interpretation require us to construe the contract as a whole and interpret contractual provisions consistently.  *Shepard*, 560 P.2d at 732; *Herling*, 2013 WY 82, ¶ 52, 304 P.3d at 964.  The majority's interpretation would render meaningless or nonsensical the other provisions which include the language "client of the practice."  We steadfastly avoid such interpretations.  *Id.*  The majority finds that the same language has two different meanings depending on its placement within the contract, which would not only require us to ignore the rule requiring us to construe a contract as a whole, but would also create confusion and disrupt the purpose of executing a contract.  While the majority suggests that the parties should have defined the term if they wanted it to be read consistently throughout the agreement, our rules of contract interpretation assume a consistent application without resort to such a definition.

*See, e.g.*, *Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1121 (7th Cir. 1990) ("[U]nless a contrary intent is evident, words used in one sense in one part of a contract are deemed of like significance in another part." (Citation omitted.)); *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 132 Cal.Rptr.2d 151, 159 (Cal. Ct. App. 2003) ("[T]he 'same meaning rule' [is] a rule of contract interpretation requiring that an identical phrase or word used in a contract be given the same meaning throughout the contract in the absence of anything in the contract suggesting otherwise."); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570, 115 S.Ct. 1061, 1067, 131 L.Ed.2d 1 (1995) (In statutory construction, "identical words used in different parts of the same act are intended to have the same meaning[.]").

[¶50]   Finally, the majority's dissertation on what "is" means is unpersuasive. Our task in contract interpretation is to examine the plain meaning of contract language "at the time the agreement was made." *Wallop Canyon Ranch*, 2015 WY 81, ¶ 35, 351 P.3d at 953 (citation omitted). The phrase, "is not a client of the practice" therefore refers to the time the agreement was entered into.

[¶51]   I would find that "client of the practice" refers to those clients maintained by the practice at the time of the sale, which included the Fremont County Fire Protection District.